Roy McDowell and Doris Collins McDowell appeal from a judgment based on a jury verdict awarding Travis Key and Johnnie Key $200,000 on their claims against the McDowells. Those claims alleged deceit, fraudulent deceit, misrepresentation, conspiracy to defraud, and negligence and/or wantonness.
The McDowells owned a house situated on a 1.6078-acre lot (the 2623 North Road lot) in a subdivided neighborhood. Part of the backyard bordered Red Oak Circle, a cul-de-sac. In January 1986, the McDowells had the lot surveyed. The survey divided the 2623 North Road lot into two parcels: a .34-acre lot bordering Red Oak Circle and a 1.2678-acre lot bordering North Road, on which the McDowells' house was situated. The surveyor testified that at the time he surveyed this property he set stakes along the line marking the boundary between the North Road parcel and the Red Oak Circle parcel.
In early 1986, in order to refinance their mortgage on the 2623 North Road lot, the McDowells applied for a Veterans' Administration ("V.A.") approved loan through National Heritage Mortgage Corporation. The McDowells sent a legal description of the property and a 1983 survey of the entire 1.6078-acre parcel to a loan officer at National Heritage, who sent the information, along with a copy of the V.A. loan form, to a real estate appraiser. The property was appraised based on the lot's containing 1.6078 acres.
The McDowells later decided to sell the property and placed an advertisement in a newspaper, which read, in part, as follows:
 "Sitting on over an acre of pecan [and] fruit trees. Huge brick single level [house]."
Shortly thereafter, the Keys responded to the advertisement and met Mrs. McDowell, who was a licensed real estate salesperson, at her house. The parties dispute what happened in the negotiations. Viewing the evidence most favorably to the Keys, which our standard of review requires us to do, we conclude that the jury could have found the following facts: Mrs. McDowell indicated that the entire 1.6078-acre lot was the property that the McDowells proposed to sell. There was nothing visible in the backyard indicating that the North Road parcel did not include the Red Oak parcel. Mr. McDowell also indicated that the entire 1.6078-acre lot was the property that the McDowells proposed to sell. The Keys never saw any stakes marking the boundary between the North Road parcel and the Red Oak Circle parcel. The surveyor testified that between the time he surveyed the property and the time the sales contract was signed he replaced all of the boundary stakes, including the stakes between the North Road parcel and the Red Oak parcel, five or six times because the stakes kept disappearing.
There was evidence that, while touring the property, Key asked McDowell if he knew the exact acreage of the property, and that McDowell replied that he did not know, and that Key said it looked like "about two acres" and McDowell replied "it could be."
The Keys were not sophisticated buyers. Mr. Key, who conducted most of the negotiations, had received a general educational development (G.E.D.) certificate after having dropped out of school in the ninth grade. At the time of the negotiations, he had recently retired after 33 years of work as a machine operator. Although he had purchased real estate four times before, and had seen surveys in connection with those purchases, he said he did not know that lenders required a survey before closing a loan. Mrs. McDowell was a licensed real estate agent, bound by the "Code of Ethics and Standards of Practice of the *Page 1245 
National Association of Realtors," which requires her to adhere to that Code when she is the principal in a sale of property. Key testified that Mrs. McDowell told him that she would take care of everything but the financing. Key further testified that Mrs. McDowell suggested that Key use the McDowells' V.A. appraisal in order to save time. She arranged for National Heritage to send the V.A. appraisal to the Keys' mortgagee, First Security, without telling Key that this appraisal included the entire 1.6078-acre lot, although she was not selling the Keys that entire lot.
On September 2, 1986, Key executed a sales contract, the forms for which were provided by Mrs. McDowell, for the purchase of the McDowells' property. The contract identified the McDowells' property as being located at 2623 North Road. The space provided for a legal description of the property was left blank.
On September 6, 1986, a new survey was completed, which excluded the Red Oak Circle parcel. Mrs. McDowell delivered a copy of the survey to the loan officer at First Security.
The Keys did not examine the property after the sales contract was signed. The sale was closed on October 17. The Keys paid for the North Road property at the closing. Key testified that the documents he signed at that time did not contain a legal description (i.e., a description beyond the street address) and that no survey was then available. Key testified that he requested to see the warranty deed, but did not see it; and that he was told that the deed would be delivered to him after the McDowells, who were out of town, had signed it. Key said that he and his wife did not receive copies of the closing documents until approximately three weeks after the closing. The deed described only the 1.2678-acre lot.
The Keys moved into the North Road house in November 1986. Shortly thereafter, Key discovered a notice for rezoning posted on a tree near Red Oak Circle.
On January 1, 1987, the McDowells conveyed the Red Oak Circle parcel to Mrs. McDowell's daughter, who has constructed a house thereon.
The trial court denied the McDowells' motion for a judgment notwithstanding the verdict, or, alternatively, a new trial; and they appeal, presenting four issues for review.
 Issue I
The McDowells argue that the trial court erred in overruling their motion for a mistrial based on allegedly prejudicial testimony of Ritzie Moore, the plaintiffs' daughter.
During the examination of Mrs. Moore, plaintiffs' counsel elicited the following testimony:
 "Q. Well, just let me ask it this way, Ritzie, and maybe we can answer it this way. Have you had any opportunity to observe your parents and noticed that they have had any kind of apparent problems or been worried or it's caused them any anxiety, anything of that nature that you have observed, yourself?
"A. Yes.
"Q. All right. Tell us what you have observed?
 "MR. McDORMAN: Judge, I object again. I don't see how that can be admissible or relevant. It's to a lay witness testifying about her mother. Of course, she's going to testify for her mother and daddy. I don't think it's admissible testimony.
 "THE COURT: Overrule. You may tell us what you have observed.
 "THE WITNESS: I have observed my parents being very upset, very hurt. Excessive anxiety and stress during this whole ordeal. It has made my mother's nerves very bad, added to the things that she didn't need extra stress. My father has had a lot of stress on him. He just had open heart surgery and he didn't need this.
"MR. McDORMAN: Move for a mistrial.
 "THE COURT: I'm going to sustain the objection. Ladies and gentlemen, the open heart surgery has nothing to do with this. You're not to be influenced or *Page 1246 
give sympathy or prejudice or let your emotions be involved by the fact that this gentleman has had open heart surgery. I instruct the witness to answer the questions closely from this point on; young lady, don't tell us anything to try to prejudice this jury. . . .
"MR. McDORMAN: Move for a mistrial.
"THE COURT: Overrule your motion."
In order for the admission of evidence to be reversible error, the appellant must show that the admission was erroneous, and that "the error complained of has probably injuriously affected [the] substantial rights of the parties."Dinmark v. Farrier, 510 So.2d 819, 821 (Ala. 1987), quoting Rule 45, A.R.App.P. See Ritter v. State, 494 So.2d 76
(Ala.Civ.App. 1986).
The McDowells contend that Mrs. Moore's testimony implies that her father's open heart surgery resulted from discovery of the alleged fraud. They argue that the statement was so prejudicial that the trial court's instructions to disregard the statement could not eradicate its effect. The Keys admit that the statement indicated that the discovery of the fraud placed stress on Key at a time when he had had open heart surgery, and they admit that the trial court properly instructed the jury to disregard it. However, they contend that the statement did not injuriously affect the substantial rights of the McDowells. The Keys argue that the trial court's immediate action in instructing the jury to disregard it cured any resulting prejudice.
In Lloyd Noland Foundation, Inc. v. Harris, 295 Ala. 63,322 So.2d 709 (1975), an action for damages resulting from personal injuries, the plaintiff's husband injected insurance into the case by nonresponsive testimony to a proper question. The trial court sustained the objection to the testimony and instructed the jury to disregard it. We held that the actions of the trial court eradicated any prejudicial effect of the witness's testimony.
Similarly, we conclude that the trial court's prompt admonishment to the jury to disregard Mrs. Moore's statement eradicated any prejudicial effect.
 Issue II
In their motion for a judgment notwithstanding the verdict or, alternatively, a new trial, the McDowells contended that the trial court erred in orally charging the jury that "a person has a duty to disclose all relevant information if someone inquires about a relevant matter." The trial court denied the motion and the McDowells seek review of the issue.
A strong presumption of correctness attaches to a trial court's ruling on a motion for new trial, and the ruling will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error. Hill v. Sherwood, 488 So.2d 1357, 1359
(Ala. 1986). But, where the record reveals that an erroneous charge is given to the jury, a new trial is required.Beneficial Management Corp. of America v. Evans, 421 So.2d 92
(Ala. 1982).
In considering the propriety of the jury instruction complained of, we must read it in conjunction with the jury instruction immediately preceding. Both instructions state the law as given in Boswell v. Coker, 519 So.2d 493 (Ala. 1987). The jury instruction immediately preceding the jury instruction complained of restates the following from Boswell:
 "Ordinarily, a real estate agent selling a used home is under no duty to speak; however, 'where one responds to an inquiry, it is his duty to impart correct information, and he is guilty of fraud if he denies all knowledge of a fact which he knows to exist, or if he gives equivocal, evasive, or misleading answers calculated to convey a false impression, even though literally true as far as they go, or if he fails to disclose the whole truth.' Jackson Co. v. Faulkner, 55 Ala. App. 354, 363-64, 315 So.2d 591 (1975), quoting American Bonding Co. of Baltimore v. Fourth Nat. Bank, 206 Ala. 639, 641, 91 So. 480, 482 (1921); see Collier v. Brown, 285 Ala. 40, 228 So.2d 800 (1969); *Page 1247 Ray v. Montgomery, 399 So.2d 230, 232 (Ala. 1980)."
519 So.2d at 495. (Emphasis added.) The jury instruction complained of merely summarizes the Boswell language.
If the Keys had not inquired about the property, the McDowells would have been under no duty to speak. However, there was evidence that the Keys did inquire about the property. The McDowells contend that the only "inquir[y] about a relevant matter" occurred when Mr. Key questioned Mr. McDowell about the acreage of the North Road property. We disagree. There was evidence that the Keys inquired of both Mr. and Mrs. McDowell about the boundaries of the property. The jury instruction complained of properly states the duty of a seller of a used residence, or his real estate agent, to respond when someone inquires about a relevant matter. Boswell, supra. See Fennell Realty Co. v. Martin, 529 So.2d 1003, 1005
(Ala. 1988). Therefore, the trial court did not err in charging the jury as it did.
 Issue III
The McDowells contend that the trial court erred in submitting the Keys' fraud claims to the jury because, they argue, the Keys could not, as a matter of law, have relied on the statements allegedly made by the McDowells. They argue that the facts, as the Keys tell them, should have led the Keys to discover the truth. That is, the McDowells argue that the absence of a warranty deed at closing and the absence of a legal description and a survey in the documents comprising the mortgage note and the mortgage should have excited inquiry, which, they say, would have led the Keys to discover the true boundaries of the North Road parcel.
The Keys' complaint was pending on June 11, 1987; therefore, the Keys had to present only a scintilla of evidence of each element of fraud for this claim to be properly submitted to the jury. Dardess v. SouthTrust Bank of the Quad Cities,555 So.2d 746 (Ala. 1989). This Court stated in National Sec. Fire Cas.Co. v. Vintson, 454 So.2d 942, 943-44 (Ala. 1984):
 "A directed verdict is proper only where there is a complete absence of proof on a material issue or where there are no disputed questions of fact on which reasonable people could differ. Ritch v. Waldrop, 428 So.2d 1 (Ala. 1982). When a motion for directed verdict is requested, the entire evidence must be viewed in a light most favorable to the opposing party. Ott v. Fox, 362 So.2d 836 (Ala. 1978)."
"Reliance" by the plaintiff on the representation of the defendant is an element of fraud. P S Business, Inc. v. SouthCentral Bell Telephone Co., 466 So.2d 928 (Ala. 1985). InHickox v. Stover, 551 So.2d 259, 263 (Ala. 1989), this Court stated:
 "In light of modern society's recognition of a standard of business ethics that demands that factual statements be made carefully and honestly,
 " '[r]eliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied
on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." '
 "Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala. 1989) (Hornsby, C.J., concurring specially)."
(Emphasis added.) Thus, the issue is whether the Keys could be found to have justifiably relied on the McDowells' representations even though at closing there was no warranty deed and the mortgage note and the mortgage itself contained no legal description and no survey was available.
This Court addressed this issue in Cahaba Valley DevelopmentCorp. v. Nuding, 512 So.2d 46 (Ala. 1987), in which the facts were as follows: The plaintiffs, Mr. and Mrs. Nuding, responded to an advertisement for the sale of a house and three acres of land. Mrs. Nuding viewed the property twice, the second time with the *Page 1248 
seller's real estate agent, who showed her the boundaries and told her that the unfenced property contained three acres. The plaintiffs signed a sales contract that described the property as being three acres, more or less. The plaintiffs lived in the house until closing. A day before the closing a survey was made, which did not indicate the acreage of the property, and stakes were put down marking the boundaries. That day, Mr. Nuding and the surveyor viewed the property, and both expressed doubt about whether the property consisted of three acres. After the closing, the surveyor computed the acreage to be 1.1 acres. The plaintiffs sued and the jury found in their favor. On appeal, the sellers argued that the plaintiffs could not have relied on the defendants' misrepresentations because the plaintiffs suspected before the closing that the property did not contain three acres. Stating that the evidence was disputed as to whether the plaintiffs had actual cause to suspect that the property was less than three acres, we upheld the jury verdict, while recognizing the following law on reasonable reliance:
 " 'We have no quarrel with the basic legal proposition that the representee's reliance must be reasonable under the circumstances; and, where a party has reason to doubt the truth of the representation or is informed of the truth before he acts, he has no right to act thereon. We reaffirm the principle of the law of fraud that knowledge of such facts which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts, operates as notice of these other facts.' "
512 So.2d at 49, quoting from Bedwell Lumber Co. v. T TCorp., 386 So.2d 413, 415 (Ala. 1980).
The facts in this case in favor of the Keys are stronger than those in Cahaba Valley Development, supra, were in favor of the Nudings. In Cahaba Valley Development, the plaintiffs received all the property they expected to receive; however, that property did not contain as many acres as it was represented to contain. In the case at issue, the McDowells told the Keys that the North Road property included property that it did not include. The author of this opinion and Chief Justice Torbert dissented on the issue of reliance in Cahaba ValleyDevelopment. In this case, the jury could find that there were no facts "which ought to excite inquiry and which, if pursued, would lead to knowledge of other facts" so as to operate as knowledge of those other facts. Therefore, the trial court did not err in submitting the issue of fraud to the jury.
 Issue IV
At the close of all the evidence, the trial court instructed the jury that if it found for the Keys, it should award the Keys compensatory damages for the loss in the value of the land and the mental anguish they suffered,[1] if any, and that if it found that the McDowells had knowingly committed legal fraud, then it could award punitive damages. The trial court directed the jury to answer the following interrogatory: "If you return a verdict for the Plaintiffs what was the loss in the value of the land at the date of injury?" The jury determined that the loss in the value of the land was $10,000.[2] Therefore, $190,000 was to compensate the Keys for mental anguish and/or to punish the McDowells.
In their motion for a judgment notwithstanding the verdict or, alternatively, for a new trial, the McDowells alleged, among other things, that the verdict was excessive. *Page 1249 
The trial court conducted a post-judgment hearing on the motion and denied it.
The McDowells did not argue in support of their post-trial motion that their financial position should be considered. Nothing was introduced at the hearing on this motion to indicate what effect this judgment would have on the McDowells. We cannot hold the trial court in error for not considering an argument that was not made. Likewise, we do not know how much of the $190,000 was to compensate the Keys for their mental anguish and how much was to punish the McDowells and to deter them from committing similar conduct again.
In Wilson v. Dukona Corp. N.V., 547 So.2d 70, 73 (Ala. 1989), this Court stated the following concerning the review of a jury's award of damages:
 "In dealing with compensatory damages, the interest of the uncompensated victim must always be kept foremost in mind. . . . When considering punitive damages, however, the defendant's right to fair punishment must be considered above the plaintiff's right to recover the fullest amount of punitive damages. . . .
 "Because the purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter the wrongdoer and others from committing similar wrongs in the future, the proper amount of punitive damages rests largely within the jury's discretion. However, although punitive damages need bear no particular relationship to actual damages, they, nonetheless, must not exceed an amount that will accomplish society's goals of punishment and deterrence. . ..
 "To summarize then, in a case such as the present one, where the excessiveness vel non of a jury verdict awarding compensatory and punitive damages is an issue, the focus is on the plaintiff with regard to the propriety of the compensatory damages award, and on the defendant with respect to the propriety of any assessment of punitive damages." (Citations omitted.) (Emphasis added.)
In the present case, we cannot discern what portion of the $190,000 might have been awarded to compensate the Keys and/or what portion was awarded to punish the McDowells. Therefore, giving primacy to the Keys' interest in being fully compensated, we would not be inclined to remit any portion of the general verdict until it is evident that, after allowing as much as could possibly be allowed for compensation, the remaining portion of the general verdict would, considering the defendant's financial condition, exceed an amount necessary to accomplish society's goal of adequately punishing and deterring the McDowells. The McDowells have the responsibility of convincing us of this and they have failed to do so.
Based on the foregoing, we affirm the trial court's judgment.
AFFIRMED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.
[1] The McDowells did not object to this instruction on mental anguish; therefore, compensatory damages for mental anguish were recoverable in this case. We need not decide whether it would have been error for the trial court to instruct on mental anguish under the facts of this case if such an instruction had been objected to. See B M Homes, Inc. v. Hogan, 376 So.2d 667
(Ala. 1979).
[2] While the judge instructed, and the jury responded, in terms of "loss in the value of the land," we note that this case does not seem to be dealing with an actual "loss in value." We understand the judge and the jury to be dealing with a difference in the value the sold lot actually had and the value it would have had if it had contained the additional .34-acre Red Oak Circle parcel. No objection was made on this point.