[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 156 
This is a fraud case. The complaint alleged generally that the defendants represented to the plaintiff that the property the plaintiff purchased was located on a public road, that the property was suitable for the placement of a septic tank, and that the real estate located between the driveway of the property and Griggs Road would be deeded to the plaintiff by the defendants upon the sale of the property owned across the road by the defendants. The plaintiff purchased the house and lot from the defendants and later discovered that the property would not support a standard septic tank system. The plaintiff also discovered that most of the front yard he had purchased was subject to a right-of-way owned by the county. The case was submitted to the jury on the plaintiff's fraud and misrepresentation claims. The jury returned a verdict of $70,000 compensatory damages and $100,000 punitive damages. The trial court denied all post-trial motions, and the defendants have appealed.
 Facts
The plaintiff, Finley, testified that he inquired about the property at issue in this case after seeing a sign advertising a lot for sale. He contacted the owners of the lot, a husband and wife, Wanda and Jerry Griggs, and arranged to look at certain property owned by them.
One parcel included a yellow house; that parcel is located at 245 Griggs Road in Huntsville. The plaintiff walked through the house with Jerry Griggs, noting that it needed some work. Finley testified that Griggs told him that the asking price was $90,000. Finley indicated that he would need time to think about all the properties he had looked at that day. According to Finley, there was no discussion about any right-of-way at that time.
Finley testified that several days later he offered Griggs a purchase price of $91,000. (We note that the record bears out the unusual event that Finley offered $1,000 more than Griggs asked.) Griggs testified that there might have been two additional meetings between him and Finley. According to Finley, Griggs agreed to this price the next day. Finley testified that on December 2, 1985, he and Griggs met to discuss the contract.
The Right-of-Way
Finley testified that Griggs told him that "the front yard right now is not your property," that Griggs had given the county a 50-foot right-of-way through the front yard of the lot to assist the county engineer in building the road. Griggs's testimony indicates that the county engineer wanted to build the road on a flat part of the Griggses' property rather than to have to blast out the side of a hill located in the right-of-way. Griggs agreed to the building of the road on a portion of his property not subject to the right-of-way he had previously granted. He testified that he intended to later give the City of Madison a right-of-way to the land containing the road in exchange for a release of the property subject to the existing right-of-way.
According to Finley, Griggs told him that all that needed to be done was to swap the deeds for the land, giving the county the road on Griggs's land, and releasing to Griggs that portion of his yard subject to the right-of-way. It is not clear from the record who actually owns the right-of-way at present. The record shows that the initial right-of-way was held by the county. Griggs had not done this, according to Finley, because he had not found the time. *Page 157 
Finley testified further that he made it clear to Griggs that if he could not have the front yard, he did not need to buy the house.
Griggs testified that the first meeting was at a local restaurant and that he told Finley about the septic tank problem and the problem involving the right-of-way.
Griggs testified that the mayor of the City of Madison wanted to deed the right-of-way to Finley so that the City would have no obligation for this property. He insists that he did not tell Finley that he could accomplish the deed swap and kept Finley informed of the progress of his negotiations. Griggs's testimony also indicates that he made numerous attempts to work out the problem with the city and county officials and engineers.
Griggs also testified that he explained to Finley that Griggs Road was a private road, and that he told Finley that he would attempt to get the city or county officials, to trade the right-of-way and make the road public. He insists that he did not assure Finley he could do this and did not know who he was going to deal with. He admits, however, that Finley did tell him that if the front yard consisted mostly of land subject to a right-of-way, Finley did not want the house.
Griggs further testified that he has delivered a quitclaim deed to Finley, but that the land referred to in that deed was not the land in Finley's front yard that was subject to the right-of-way but another parcel of land, consisting of .39 acres. He contended at one point in the record that this fulfilled the requirement of the contract that "seller agrees to deed strip between driveway and Griggs Road upon closing sale of 245 Griggs Rd. to buyer." His later testimony contradicts this explanation.
Discussions Regarding the Septic Tank
Griggs and Finley discussed the other parts of the contract. While the contract shows the property for sale as "248 Griggs Road," we note the correct location is "245 Griggs Road." According to Finley, they also "went over the dollar amount" and Griggs then asked Finley, "You do know about the septic tank?" Finley said he replied in the negative and that Griggs informed him that the Griggses owned a larger white house across the street from the one to be purchased by Finley. The house Finley was buying did not have a separate septic tank system, but was connected to the defendant's septic tank system across the street. Because the Griggses owned all the land on both sides of the road, both houses were connected to the same system in order to save money.
Finley told Griggs that because he did not know anything about septic tanks, he wanted Griggs to add the septic tank to the cost of the purchase price and "we will work around that." Finley testified that Griggs told him that it would cost approximately $750 for a septic tank. Finley testified that Griggs then told them that "anyway, the front yard that we just walked over, that's where the County Board of Health told me where your septic tank is supposed to go because we are going to switch out these deeds." Finley asserts that Griggs told him that he had a permit for the installation of the septic tank, and that he showed Finley where in the yard it was to be placed.
Finley admits that he knew of the need for a septic tank in the future, and that in the contract there was included a provision indicating that he knew that. However, Griggs testified that he did not remember much discussion at the first meeting regarding the septic tank. Griggs insists that he was not present when this addition was made to the contract, and that Finley included this portion on his own. Griggs further insists that he did not know that the property purchased by Finley would not support a septic tank. He said he did not remember being told by the former chief sanitarian for the Madison County Department of Public Health, W.T. Garrison, that the lot would not support a septic tank system. Griggs testified that sometime in 1976 a septic tank permit was issued for the lot on which the plaintiff's house is located, and that another one was issued about eight months later. *Page 158 
Both men signed the contract. Mrs. Griggs was not present during the negotiations; Finley testified that Griggs told him the next day that she also had signed the contract. Griggs's testimony is that Mrs. Griggs was not an active participant in the negotiations, but that he was acting for both of them because they were both owners of the property.
Finley testified that at the closing he again made it clear with the closing attorney that unless he was getting the land without its being subject to the right-of-way, then he did not want to purchase the house. He said he was told that the contract for sale was valid and that he would "get the strip of land." Additionally, he testified that when the closing attorney read over the part of the contract about the septic tank, both Mr. and Mrs. Griggs stated that they had a permit for the septic tank for that house. Finley was told that when the Griggses sold their house across the street he would need to install his own septic tank.
Finley first became aware of the extent of the right-of-way when he received a copy of the survey at the closing. Again, Finley indicates that both Mr. and Mrs. Griggs told him at the closing that they owned the land on which the road was built and would swap deeds with the county. He testified that he checked with Griggs regularly regarding the swapping of the deeds.
Finley said he moved into the house the third week of January 1987 and began making renovations in February. He continued making renovations until September or October 1987, when he discovered that his land would not pass the percolation test and would not support a traditional septic tank. He said he also discovered that there had not been a permit issued for the 2.91 acres. He testified that he has paid the Griggses all the amounts due under the contract.
 Issues
The Griggses have presented 27 issues on appeal. Generally, these issues deal with whether the trial court committed error:
1. denying the Griggses' motions for judgment on the pleadings, for directed verdict, or alternatively for new trial or JNOV;
2. in allowing the plaintiff to generally amend his complaint to conform to the evidence presented at trial;
3. in instructing the jury;
4. in admitting evidence of the expenses for renovation as submitted by the plaintiff; and
5. in allowing testimony of the plaintiff's expert as to the market value of the property in 1989.
The defendants have also claimed that the jury verdict is against the great weight and preponderance of the evidence and that it is excessive. In addition, the Griggses claim that the trial court erred in not ordering a remittitur and in failing to state on the record the criteria considered when it determined that the punitive damages award was not excessive. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986).
 Discussion
Post-trial Motions
The Griggses complain that the trial court should have granted their motion for a directed verdict and their motion for JNOV as to the claim alleging fraudulent representations regarding the suitability of placement of a septic tank system. We find these claims to be without merit, given the testimony found in the record.
Mr. W.T. Garrison testified that he is now an environmental consultant and that he performs soil work, percolation tests, and site evaluations for sewer systems. He had been the chief sanitarian at the Madison County Department of Public Health for 30 years.
Garrison had visited the property now known as 248 and 245 Griggs Road in 1976. His testimony indicates that he issued a permit for the Griggses' white house, but never for the property now owned by Finley, which is across the street from the Griggses' white house. Garrison's testimony shows that because the Griggses owned *Page 159 
all of the property when he visited the site in 1976 and 1977, they "bent the rules a little," issuing a permit to serve the yellow house with the septic tank to be installed on the property where the white house was located. The yellow house, he said, was to be used only for sleeping quarters by the Griggses, with no washing or cooking to be done there. This testimony serves to clarify the notations made on Defendants' Exhibits 1 and 2 showing that the permits were issued in 1976 and 1977 for a home the size of the yellow house, and it clarifies the conflicting testimony of Mr. Tipton.
Garrison returned to the property in 1977 and saw that a yellow house had been moved onto 245 Griggs Road. Griggs told him the yellow house was to be used as sleeping quarters, but Garrison could not determine how a septic tank could be installed. There was no requirement, however, in 1977 that a percolation test be done on the property, but there was still a requirement that the property support a septic tank system. In 1977 he could not find an area that would support a system.
He was requested to return to the property again in 1978 to locate a place for the septic tank suitable for the address at 245 Griggs Road. The record is unclear, however, whether Garrison was visiting 245 or 248 Griggs Road. He did not conduct a "perk" test in 1978 on the Finley property and could not find a place where it was feasible to drill a hole. He states that he communicated this to the person who requested him to visit the property. Griggs denies that Garrison told him this.
Garrison said that Mrs. Finley asked him to perform a percolation test in October 1987. He told her that he was already familiar with the property and that if he tested it he would "just be taking their money," because he would know before coming to the property what the results would be. Garrison testified that because most of cases he dealt with did not reach him unless they were unusual, he specifically remembered visiting virtually every site he investigated. Contrary to this testimony, Mr. Tipton, who worked under Mr. Garrison, could not recall whether he issued the first permit from the office or issued it after he visited the site. In fact, Tipton testified that when he had talked with Mr. Finley's attorney, he could not remember anything about the permits and referred the attorney to Mr. Garrison.
Garrison said that he again returned to the property in 1988 at the request of Finley's attorney, in an attempt to conduct a "perk" test, but could not drill to the maximum depth of three feet in the right-of-way or in any other part of the property. His testimony indicates that the Finley property will not support a standard septic tank system. Garrison said he also determined the feasibility of connecting the house to the city sewer system. He estimated the cost for running a sewer line for 505 feet — the distance involved — to be $50 a foot, which did not include rock removal, blasting, or manholes. He did not determine a total figure because of the undeterminable amount of blasting needed.
The standard of review for a motion for JNOV is the same standard used by the trial court in granting or denying a directed verdict motion initially. Alpine Bay Resorts, Inc. v.Wyatt, 539 So.2d 160, 162 (Ala. 1988); citing Turner v. PeoplesBank of Pell City, 378 So.2d 706 (Ala. 1979). "Granting a motion for JNOV is proper 'only where there is a complete absence of proof on a material issue or where there are no controverted questions of fact on which reasonable people could differ' and the moving party is entitled to judgment as a matter of law." Alpine Bay Resorts, at 162, citing Deaton, Inc.v. Burroughs, 456 So.2d 771 (Ala. 1984). See McDowell v.Key, 557 So.2d 1243 (Ala. 1990).
Section 6-5-101, Ala. Code (1975), reads:
 "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud."
Hammond v. City of Gadsden, 493 So.2d 1374, 1377 (Ala. 1986). This Court has previously written: *Page 160 
 "Regardless of whether the representations were made willfully, recklessly, or mistakenly, it has been held: (1) that there must be a false representation; (2) that the false representation must concern a material existing fact; (3) that the plaintiff must rely upon the false representation; and (4) that the plaintiff must be damaged as a proximate result."
Hammond, supra, citing International Resorts, Inc. v. Lambert,350 So.2d 391 (Ala. 1977). This Court has further defined the reliance aspect of a claim for fraud in Hickox v. Stover,551 So.2d 259, 263 (Ala. 1989). See also McDowell v. Key, supra;Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92
(Ala. 1989) (Hornsby, C.J., concurring specially).
From the testimony set out above, we conclude that it was not error for the trial court to deny the defendants' motion for directed verdict or the motion for JNOV as to the allegations of fraudulent representations concerning the septic tank and the right-of-way. That evidence supported the jury's finding of misrepresentation and supports a finding that plaintiff's reliance on these representations was justifiable, because the evidence would not require a finding that the representations were so "patently and obviously false that he must have closed his eyes to avoid the discovery of the truth." Hickox, supra.
The defendants further claim that the jury verdict was decidedly against the great weight and preponderance of the evidence, even when viewed in a light most favorable to the plaintiff. Because or the testimony as set forth in detail above, we can not agree.
Amendment of the Complaint/Proper Pleading
The defendants complain that the trial court erred in granting the plaintiff's motion to amend the complaint to conform to the evidence presented at trial. This issue is clearly resolved by Rule 15(b), A.R.Civ.P. Amendments are to be freely allowed. An amendment of the pleadings may be necessary to cause them to conform to the evidence, and a motion to amend may be made by any party at any time, even after judgment. The party objecting to the amendment must satisfy the court that the amendment would prejudice him. The record shows that the trial court perceived no prejudice to the defendants. SeeSchoen v. Styron, 480 So.2d 1187 (Ala. 1985); Bischoff v.Thomasson, 400 So.2d 359 (Ala. 1981); B M Homes, Inc. v.Hogan, 376 So.2d 667 (Ala. 1979). See also Comments, A.R.Civ.P. 15. We perceive no prejudice either.
The defendants also complain that the plaintiff's complaint did not properly allege fraud and that the trial court erred in denying their motion for judgment on the pleadings. The pleading requirements for fraud are found in Rule 9(b), A.R.Civ.P. Specifically, that rule provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."
From a review of the complaint, we conclude that the circumstances constituting the fraud were stated with sufficient particularity, and that the court properly denied the defendants' motion for judgment on the pleadings. We also conclude that the court properly submitted the plaintiff's claims to the jury.
Jury Instruction
The defendants assert that the trial court erred in several areas in orally instructing the jury. First, they contend that the trial court charged that if the false representations were made by Mr. Griggs and "adopted" by Mrs. Griggs then she would be equally guilty. When a trial court's oral charge is a correct statement of the law, there is no reversible error. Rule 51, A.R.Civ.P.; see McLemore v. Alabama Power Co.,289 Ala. 643, 270 So.2d 657 (1972). We further note that in our review of alleged error, where the objected to portion of an oral charge is misleading, abstract or incomplete, reversible error will be determined only from a review of the entire instruction. Alabama Power Co. v. Tatum, 293 Ala. 500,306 So.2d 251 (1975). *Page 161 
A review of the record shows that defense counsel admitted that this was a correct statement of the law, but contended that there was no testimony on this point. We disagree. There is evidence that Mr. Griggs had Mrs. Griggs sign the contract and that she was present at the closing when several of the statements were made. Mr. Griggs testified that in the transaction he was representing both himself and Mrs. Griggs. See J.C. Jacobs Banking Co. v. Campell, 406 So.2d 834, 847
(Ala. 1981)("[t]he fact that a husband is the agent of the wife may be implied from the circumstances").
Second, the defendants contend that the instructions regarding the law of deceit as it relates to fraudulent "suppressions" or nondisclosure of material facts was in error. Having discussed the defendants' concerns as to this issue in other parts of this opinion, we find this issue to need no further discussion.
Evidence of Renovation/Expert Testimony
The plaintiff testified to the extensive renovations he made to the house, and certain documents were admitted into evidence over the defendants' objections. The defendants claim that this testimony and the records of these expenses were improperly allowed into evidence. The total amount expended was $41,333.71. At trial, defense counsel objected that the amounts had not been shown to be reasonable, that they did not occur after Finley learned of the alleged misrepresentations, and that they were not the recoverable measure of damages under the "benefit of the bargain" rule.
The Griggses also argue error by the trial court in the admission of testimony by Thomas E. Garrett, the plaintiff's real estate expert. The defendants claim that Garrett's testimony regarding the 1989 value was error, and that in fraud actions the "benefit of the bargain" rule is to be used and should only relate to the time the alleged fraudulent acts occurred.
Garrett did testify that in 1989 the cost to run a line to the city sewer connection would be approximately $15,000. Because the subdivision closest to the Finley property did not exist in 1985, he did not attempt to calculate what the cost would have been in 1985. He valued the property at a 1989 price with adequate sewer at $135,000 and without sewer at $92,500. However, Garrett also testified that the 1985 value of the property with an adequate sewer facility would have been $90,000, and $60,000 without a sewer facility. The defendants overlook the testimony of Mr. Garrison, who also determined the cost generally of installing a sewer line to the plaintiff's property from the closest city connection.
We hold that the general measure of damages for fraud includes all damages within the contemplation of the parties or which are the necessary or natural and proximate consequences of the wrong. This is a factual determination to be made by the jury. Reinhardt Motors, Inc. v. Boston, 516 So.2d 509, 511
(Ala. 1986); Winn-Dixie Montgomery, Inc. v. Henderson,371 So.2d 899 (Ala. 1979). There was sufficient evidence to support the jury's award of compensatory damages, given the actual value of the property without a septic tank in 1985 of $60,000, the cost of installing an individual septic system on the property, or the cost of connecting to the closest municipal sewer line, estimated in Mr. Garrison's opinion to be $25,250. Garrison testified that he could not take into consideration the extra costs of blasting through the rock to lay the sewer line because of the inability to judge how much blasting was needed and how much the engineer's cost would be to direct and control the blasting. These additional costs, while unknown, are not speculative, and clearly add to the prior figures to exceed $70,000. There was also testimony that there was no guarantee that any individual septic system would work. The plaintiffs could be left attempting to remedy the problem by trial and error. The evidence above was presented to the jury and supports the award, regardless of the testimony concerning the plaintiff's renovations. *Page 162 
Excessive Damages
The defendants contend that the verdict was excessive, and plainly and palpably wrong as a matter of law because, they say, it included sums that were not unsupported by the evidence. They further assert that the verdict resulted from bias, passion, prejudice, corruption, or other improper motive.
A decision by the trial court to allow the verdict to stand should not be overruled unless the verdict amount is so excessive or so inadequate as to indicate prejudice, partiality, passion, or corruption on the part of the jury. As we stated in Hammond, supra, "The authority to disturb a jury verdict on the ground of excessive damages is one which should be exercised with great caution. Id., citing Airheart v. Green,267 Ala. 689, 104 So.2d 687 (1958). The trial court is in the best position to observe all the witnesses and other incidents not reflected in the record." Hammond at 1378.
The defendants assert that the award of punitive damages was excessive, that the award could not be made jointly and severally, and it was error for the trial court not to order a new trial or a remittitur. Additionally, they contend that the trial court did not state on the record the factors considered by it in awarding the punitive damages.
This court has recognized that, if the misrepresentation is shown to have been made with knowledge that it is false, then the law permits punitive damages by way of punishment.Reinhardt Motors, Inc., supra, at 512; Alabama Farm Bur. Mut.Cas. Ins. Co. v. Griffin, 493 So.2d 1379, 1384 (Ala. 1986); BigThree Motors, Inc. v. Smith, 412 So.2d 1222, 1224 (Ala. 1982). There was sufficient evidence in the record to allow the jury to determine that the Griggses knowingly made certain representations regarding the septic tank and the right-of-way with an intent to deceive.
Because the verdict included an award for punitive damages, Ala. Code (1975), § 6-11-23(b), is applicable. That section provides:
 "In all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages. Any relevant evidence, including but not limited to the economic impact of the verdict on the defendant or the plaintiff, the amount of compensatory damages awarded, whether or not the defendant has been guilty of the same or similar acts in the past, the nature and the extent of any effort the defendant made to remedy the wrong and the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of shall be admissible. . . . After such post verdict hearing the trial court shall independently (without any presumption that the award of punitive damages is correct) reassess the nature, extent and economic impact of such an award of punitive damages, and reduce or increase the award if appropriate in light of all the evidence."
There is no statutory or judicial requirement that the trial court detail its findings in a written order more specific than the oral order given here by the trial court. The record shows that a hearing was conducted for the trial court to hear evidence pursuant to Hammond, supra. Hammond requires only that the trial court "reflect in the record the reason for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." 493 So.2d at 1379. See also, D. Carr, Punitive Damages and Post-VerdictProcedures: Where Are We Now and Where Do We Go From Here?, 51 Ala. Lawyer 90 (1990). Both defendants had previously testified at length in the trial of the case and then testified again later at the damages hearing as to their ability to pay the award. The attorneys were allowed to orally argue further points not specifically set out in the record.
The trial judge stated his findings as to the punitive damages award for the record as follows:
 "As to the punitive damages award, I find that the verdict is not excessive and *Page 163 
that this is based on the testimony today and on the testimony at the trial using the Hammond case as a guideline. I do not find that the award is excessive as a matter of law, and I do not find that the verdict is based on bias, passion, corruption or other immaterial consideration and accordingly I won't substitute my judgment for that of the jury. In my opinion the judgment of the 12 people should stand, and I won't try to second guess the jury's verdict with my opinion of the facts or verdict amount."
We find that the trial court's ruling with regard to the punitive damages award was proper. See Land Associates, Inc.v. Simmons, 562 So.2d 140 (Ala. 1989).
From a review of the entire record, we find that the evidence was sufficient to support the award of $70,000 compensatory damages and $100,000 punitive damages. See McDowell v. Key, supra.
Therefore, the judgment in this case is due to be affirmed.
AFFIRMED.
MADDOX, ALMON, ADAMS and STEAGALL, JJ., concur.