This is an appeal from a judgment based on a jury verdict in favor of the defendant, the City of Mobile.
During the evening of May 5 and the early morning hours of May 6, 1981, the City of Mobile received unusually heavy rainfall. In terms of hourly intensity, the rainfall exceeded the previous record established in 1949 of 3.51 inches. The National Weather Service at Bates Field reported the City of Mobile as receiving 7.96 inches of rain during the 24-hour period ending in the early morning hours of May 6, 1981; however, other measuring stations in town reported rainfall in excess of 13 inches. One expert classified the rain as a 500-year flood — one of such magnitude as not likely to recur for 500 years.
The City of Mobile was declared a federal disaster area after suffering some $35,000,000 worth of flood damage to approximately 1500 buildings, including 3 hospitals and 26 businesses.
The Glissons, plaintiffs in this case, own a house about 1500 feet from Eslava Creek in Mobile. On May 5 and 6, 1981, Eslava Creek overflowed its banks and inundated the Glissons' home with flood waters to a height of approximately 37 inches. The Glissons' home had never flooded before, although they had experienced some problems with water getting into the garage, in the yard, and one time into a sunken closet at the rear of the house.
Eslava Creek is a tributary of the Dog River and is in the Dog River drainage basin of the City of Mobile. The Dog River basin drains the southern part of the city, including major shopping, business, and residential districts. At trial, the Glissons sought to prove that the City of Mobile, once it assumed maintenance of Eslava Creek, failed to properly upgrade, expand, and design it so as to accommodate the expanding development of the surrounding areas. This failure, they allege, was the proximate cause of the water damage to their house and property.
After deliberation, the jury returned a verdict for the City. The trial judge denied the Glissons' motion for new trial. This appeal followed.
On appeal, the Glissons argue that error occurred in connection with defense counsel's alleged reference to insurance during his cross-examination of the plaintiff's expert witness, as prohibited by law and court order, and those jury charges given on the act-of-God affirmative defense and the City's duty to maintain Eslava Creek.
The trial court granted the Glissons' August 26, 1985, motion in limine, in which *Page 317 
they asked that the defendants be prohibited from discussing the Federal Flood Insurance Administration, flood plains, and/or the existence or availability of flood insurance.
The Glissons contend that the following colloquy between defense counsel and the plaintiff's expert was in contravention of the trial court's ruling:
"Q. . . . Now, Mr. Mott, what is a flood plain?
 "A. Well, a flood plain is an area of terrain that one would expect, given a certain flooding potential, the water to rise to that certain elevation.
 "Q. And that is a flood plain, is the area around a given stream where under certain circumstances it will seek that level? That is the flood plain and you can expect it to seek that level in certain times?
"A. For a given flood, yes.
 "Q. For a given flood. I've been told, and maybe you and I have talked about it, I don't recall. The Mississippi River has some several hundred miles in its flood plain. Do you happen to recall us talking about that?
"A. I'm just vaguely aware of that, yes.
 "Q. Do you have any idea what the flood plain is for Eslava Creek?
 "A. No, none whatsoever, because I don't think that particular portion of Eslava Creek we're talking about has ever been designated as a flood plain. To my knowledge it hasn't.
"Q. Well, then you are telling —
 "A. The flood plain in Dog River has been by the Corps of Engineers for the Flood Insurance Act, and those elevations have been defined.
 "Q. Now, when you say designated by somebody like that, that's when they really come in — FEMA, for example, will come into an area, and they will say, we designate this area as a flood plain area because it is prone to flood, and you buy insurance for that; right?
"A. That's correct.
 "Q. Now, that's not what I'm talking about. I'm talking about — whether there's insurance or not — I'm talking about any given area, a stream or not, it's going to have a flood plain to it, isn't it?
"A. Well, I —
"Q. Could be the top of the bank —
"A. Could be —
 "Q. — could be halfway up the bank, or it could be —
 "A. There again, if it doesn't rain, it doesn't flood, — so
 "Q. Doesn't rain, it doesn't flood. But if it comes as 100-year rainfall, it's going to flood, isn't it?
 "MR. DRINKARD: Judge, may we approach the bench, if it please the Court. We can just do it right there if it's okay.
"THE COURT: Whatever you think.
"(Bench Conference)
 "MR. DRINKARD: Judge, I would move for a mistrial at this time based on the fact that Mr. Moon just expressly violated the Court's granting of my motion in limine wherein the Court stated that he would go into no type of insurance, the possibility of getting insurance, flood plain, or what-have-you. It clearly set forth that in the motion in limine and I move for a mistrial right now.
"THE COURT: I deny the motion, and I'll —
"MR. MOON: Can we take this up in chambers?
 "THE COURT: I'll expand on my reasoning in a little while. I deny the motion. We have already crossed that.
"(Resumed in the presence of the jury.)
 "Q. I believe we were talking about flood plains, Mr. Mott. Excuse me for the interruption.
 "What I'm trying to get at is a flood plain as you and I would talk about it — more as you as an engineer would talk about it, I as a layman. And what I'm trying to determine for the benefit of the Court and for the jury is a flood plain — and let me put it this way: Is it common, accepted engineering practice, procedure, and understanding that when you deal with a drainage area — be it a natural creek, be it a manmade canal, or whatever — that you design understanding that *Page 318 
there is an area that will be inundated with water?
 "A. Well, that, of course, depends on the area. There are so many factors involved in that, but that could be the case, yes. There is what is known in design as allowable head water. Allowable head water is that water level you would allow the water to rise for design of the structure. You wouldn't want it to go any higher than that because of flooding potential.
 "Q. All right. You wouldn't want it to go because of flooding potential —
"A. That's correct.
 "Q. — so you then anticipate that in a certain area based on the topography, the hills and valleys if you will, that under certain circumstances — i.e., the rain or influx of water from whatever bearing — that water could or may get to a given area in height; is that fair?
"A. Well, it certainly could, yes.
"Q. I mean, that's common sense, isn't it?
"A. It's a function of how much rain —
"Q. It's common sense?
"A. Yes.
 "Q. Just like Eslava Creek, we're talking about, that if enough water comes in there, say, during this intense rain or what-have-you that that water is going to seek a high level, and it's going to get into a flood plain?
 "A. Well, let's get away from calling it a flood plain because the City didn't know anything about it let alone know whether it was a flood plain or not. They knew nothing about Eslava until it was cross-sectioned by Volkert — I mean, by Rester and Coleman.
 "Q. Well, let's talk about Mobile Bay. Let's talk about the Mobile Bay. The City of Mobile doesn't have anything to do with Mobile Bay. If you put enough water in Mobile Bay, it's going to come out of the banks and go up on the sides, isn't it?
"A. Yes, that's correct, but —
"Q. And it's going to seek a flood plain?
"(Objection by plaintiffs' counsel)
"A. Yes.
 "Q. All I'm trying to get at, Mr. Mott — and I apologize for my inability to get the question — but all I want to determine is that in any area — be it Mobile Bay or be it Eslava Creek or wherever — if you put enough water into it, that area is going to seek a natural plain that it's going to level out? Got to.
"A. Yes, it is.
 "Q. All right. And the determination of where that plain is, regardless of what you do in there, if you put enough water, it's going to get to that level?
"A. That's correct."
 With the jury not present, the court later ruled as follows:
 "THE COURT: With reference to the motion for mistrial on account of the mention of insurance, I just wanted the record to reflect that my ruling was the way it was because of the fact that insurance was first mentioned by the witness, and it seemed to me that the impression with which the jury would have been left from Mr. Moon's subsequent questions is that there wasn't any insurance covering the Plaintiffs anyway.
 "MR. DRINKARD: Well, Judge, it can certainly be taken that they were in a flood plain is what Mr. Moon was questioning, and he was questioning about a flood plain. If there is applicable insurance because of the National Flood Insurance Program, I don't know what the jury is going to draw, but they could certainly very well draw the other inference, and that is they do have insurance and they are trying to take a double bite of the pie, and we renew our motion for mistrial.
"THE COURT: Y'all have anything?
"MR. MOON: No, sir.
"THE COURT: I deny your motion."
We agree with the trial judge's ruling in this case. It is clear from the transcript that the flood plain to which defense counsel was referring is that part of the land topography bordering a river, creek, or any other body of water, where water will naturally flow over given an intense enough rainfall. Defense counsel was trying to *Page 319 
show that even if the plaintiffs could prove some negligent act by the City in maintaining or failing to maintain Eslava Creek, the Glissons' property would have flooded anyway, even in the absence of the City's negligence, as a result of the extraordinarily heavy rainfall and the location of the Glissons' property in the flood plain.
Insurance was first referred to in the case in an unsolicited answer from the plaintiffs' expert witness. In Barnes v.Tarver, 360 So.2d 953, 956 (Ala. 1978), this Court remarked:
 "We are well aware of the rule that the presence of insurance coverage is not ordinarily permitted to be injected into the trial of the case. However, in this case Barnes, the party who complains on appeal that insurance coverage was erroneously injected into the trial, is the party responsible for the fact and therefore cannot rightfully assert that fact as error."
In the case at bar, however, defense counsel also referred to the subject of insurance in his follow-up question to the plaintiff's expert.
 "It is the generally accepted rule that it will constitute grounds for a new trial if counsel, in disregard of the court's ruling that a certain line of evidence is inadmissible, persists in attempting to get such evidence before the jury to the prejudice of the unsuccessful party." Gwin v. Church, 272 Ala. 674, 682, 133 So.2d 880, 889
(1961), quoting Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225, 228, 128 So. 389, 392
(1930).
We do not believe that the Glissons were prejudiced by defense counsel's remarks. The clear meaning of the statement made by plaintiff's expert and the defense counsel in his followup questions was that since the Federal Emergency Management Agency (FEMA) had not designated the Eslava Creek area as a flood zone, there was no insurance available. It does not appear that the jury could have been left with the impression that the Glissons had already been compensated by insurance for their losses.
As this court said in American Pamcor, Inc. v. Evans,288 Ala. 416, 419-20, 261 So.2d 739, 742 (1972):
 "The number of instances when insurance is injected in a case is not the sole yardstick by which prejudice to the defendant is measured. However, the question in each case is whether counsel has overstepped that almost imaginary line between what is allowable and what is not."
Defense counsel simply did not cross that line in the case at bar.
We also find that the Glissons' objections to the jury charges are without merit.
The jury charges in issue can be put into two groups, those dealing with the act-of-God affirmative defense and those dealing with the City of Mobile's duty to maintain Eslava Creek.
As to the first group, the crux of the Glissons' argument is that these charges fail to specify that the City of Mobile could be liable for negligence in maintaining the creek even though the rainfall was the immediate cause of the damage, if the rainfall was foreseeable or precedented and not an intervening independent agency producing the injury. In reviewing the defendant's requested charges No. 42,[1] No. 43,[2] No. 45,[3] No. 47,[4] *Page 320 
and No. 48,[5] we find that each one is a correct statement of the law as applicable to this case. The charges are not confusing and do not leave one with the impression that because the rainfall was the immediate cause of damage, the City of Mobile could not be liable for its negligence.
Defendant's requested charges No. 26[6] and No. 28[7] deal with the City of Mobile's duty in this particular case. Charge No. 26 is a statement of law from Kennedy v. City of Montgomery,423 So.2d 187 (Ala. 1982), a case in which this court addressed a city's duty to maintain a drainage system. It is a correct statement of law. We are not convinced that it served to confuse or mislead the jury.
The Glissons' objection to charge No. 28 is that it seemingly gives the City of Mobile absolute immunity whenever public improvements such as new streets and buildings cause an increased flow of surface water onto adjacent private property. We disagree. Under charge No. 28, the increased flow of surface water must arise wholly from surface improvements. If the City of Mobile was negligent in maintaining Eslava Creek, then the increased flow of water did not arise wholly from changes in surrounding property. Consequently, if the jury believed that the City of Mobile acted negligently, they could have found against the city on this charge.
There appearing no merit in the plaintiffs' arguments on appeal, the judgment of the trial court is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ADAMS and STEAGALL, JJ., concur.
[1] "If you are reasonably satisfied from the evidence that the Plaintiffs' damage was a result of an overflow of Plaintiffs' land from waters of a creek caused, not by Defendant's negligence, but entirely by natural causes in the form of extraordinarily heavy rains, and that the rains were so extraordinary and unprecedented as to be Acts of God, then you cannot find for the Plaintiffs and your verdict should be in favor of the Defendant."
[2] "Even if you are reasonably satisfied from the evidence in this case that the City was negligent, if such negligence concurred with an extraordinary flood or rainfall, the City of Mobile is relieved from liability if the flow is so voluminous in character that it would of itself have produced the injury independently of such negligence. In other words, if the superior force would have produced the same damage whether or not the City had been negligent, its negligence is not deemed the cause of the injury."
[3] "If you are reasonably satisfied from the evidence that any prior negligent act by the Defendant merely created a condition or gave rise to an occasion and after creation of said condition an intervening independent agency produced the injury, the parties guilty of the first negligent act would not be liable because their negligence was but the remote cause of the injury and not the proximate cause of the injury."
[4] "However negligent a person may have been in some particular, that person is liable only to those who may have been injured by reason of such negligence as proximate causation. Where some independent agency intervened and was the immediate cause of the injury, the party negligent in the first instance is not liable."
[5] "If you are reasonably satisfied from the evidence that between the alleged negligent act of the Defendant and the injury, there occurred [an] independent, intervening, unforeseeable event, the causal connection between the alleged negligence and the injury is broken and you must find for the Defendant."
[6] "The city has a duty to maintain a drainage ditch in such a condition as to cause it not to overflow (1) if the city has undertaken control of the drainage system for the plaintiffs' properties and (2) if water from the city's drainage system — rather than natural drainage of surface water — caused the flooding problems."
[7] "A city is not liable to a property owner for the increased flow of surface water over or onto his property, arising wholly from the changes in the character of the surface produced by the opening of streets, building of houses, and the like, in the ordinary and regular course of the expansion of the city."