592 So.2d 191 (1991)
ASSOCIATES FINANCIAL SERVICES COMPANY OF ALABAMA, INC.
v.
Oliver F. BARBOUR and Ethel J. Barbour.
1900743.
Supreme Court of Alabama.
November 15, 1991.
As Modified on Denial of Rehearing January 10, 1992.
*192 Champ Lyons, Jr. and Sandy G. Robinson of Helmsing, Lyons, Sims & Leach, P.C., and Richard H. Sforzini, Jr. of Sirote & Permutt, P.C., Mobile, for appellant.
Andrew T. Citrin and Richard Bounds of Cunningham, Bounds, Yance, Crowder, and Brown, and David P. Broome of McDonough & Broome, Mobile, for appellees.
SHORES, Justice.
The defendant appeals from the denial of its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial or remittitur. The plaintiffs, Oliver F. Barbour and Ethel J. Barbour, alleged in their complaint that the defendant, Associates Financial Services Company of Alabama, Inc. ("Associates"), had made a knowing or mistaken misrepresentation of fact and had committed mistaken or negligent fraud. The jury returned a verdict for the Barbours, and the court entered a judgment on that verdict. We affirm.
Associates held a second mortgage from one Ladnier, on lot 12 in the Mark IV Subdivision in Mobile County (lot 12 will be referred to as "the property"). Because of a default by Ladnier, Associates foreclosed and acquired the property at the foreclosure sale on April 17, 1984. On July 18, 1984, Jerome Henley purchased the property from Associates. Associates never gave Henley a deed to the property. Henley's mortgage was recorded soon after its execution. At the time of closing, Henley executed an assignment of rents to Associates, which was also recorded.
*193 A title insurance policy was issued by Preferred Research, erroneously indicating the existence of a recorded deed from Associates to Henley. Associates filed a third-party complaint against Preferred Research, who subsequently impleaded its attorney, Richard Sawyer. Associates' third-party complaint was dismissed before trial.
Henley's credit report contained many "red flags" for a potential creditor (e.g., running past due with creditors anywhere from 30 to 120 days). The manager of Associates' Mobile office was Elliot Knight. Knight was responsible for approving Henley's loans. An employee of Associates had made Knight aware of Henley's credit report.
The Barbours entered into negotiations with Henley to purchase the property for $33,000. Henley had the Barbours sign two contracts for deed, one for lot 12 and the other for lot 20. Other than being able to sign their names, the Barbours can not read or write. The Barbours began living on the property, and it is undisputed that they were not behind in their payments. However, in August 1985, a representative from Associates went to the Barbours' home and informed them that they had to vacate the premises because Associates was going to foreclose, because they were behind on their payments.
Knight told the Barbours that if they wanted to keep the property they could assume Henley's mortgage to Associates. At this time, Knight presented the Barbours with a warranty deed from Henley which was recorded. This warranty deed included an assumption of Associates' mortgage, and it purported to convey both lots 12 and 20. The mortgage covered both pieces of property. When the Barbours assumed the mortgage, they were not told that the mortgage would balloon in three years, and they were not furnished a disclosure statement. Also, the Barbours were not aware that they were assuming a mortgage for approximately $4,500 more than they had agreed to pay Henley. Between the purchase by Henley of the property from Associates and the assumption of the mortgage by the Barbours, two judgment liens were recorded against Henley. These judgment liens had the effect of clouding the title.
In 1986, the Barbours decided to sell their property to one of their sons. At this time, a title search was conducted and the two judgment liens were discovered. The Barbours made no further payments. Associates then demanded payment under the balloon provision.
On November 19, 1986, the Barbours sued Associates, claiming intentional or reckless misrepresentation of fact. The complaint was amended to add a second cause of action for mistaken or negligent fraud. The jury returned a verdict awarding $7,500 compensatory damages and $350,000 for punitive damages to each plaintiff.
Associates contends that there was not sufficient evidence for the jury to find that Associates had misrepresented the status of the title or that the Barbours had acted to their detriment in reliance on any misrepresentations. According to the record of the closing arguments, Associates' trial counsel admitted that Associates had defrauded the Barbours and was liable for damages:
"[By Mr. Sforzini:] We'd like to correct the situation. Sure. Elliott Knightand he was Associates. He was an agent, well, he was an employee of ours and under the law the judge is going to instruct you ... we were responsible for what he did. But he's also going to talk aboutyou're also going to be asked to bring in punitive damages against my client in this case to punish us. Should we be punished for what we did? We're responsible under the law for the damages that Mr. and Mrs. Barbour suffered, if any,and have been damaged because Elliott Knight and Associates didn't give Mr. Henley a deed. Those are called compensatory damages."
Associates' counsel continued:
"So, we're entitled to pay themI mean, we are bound to pay them compensatory damages in this case if you find that there are any."
*194 Associates now contends that the trial court should have entered a JNOV on the question of liability for fraud even though Associates admitted liability during closing arguments.
In Housing Authority of the City of Prichard v. Malloy, 341 So.2d 708 (Ala. 1977), the plaintiff claimed damages for moving expenses and claimed the balance of his salary. The defendant moved for a directed verdict at the end of the plaintiff's case and at the close of all the evidence. Both of its motions were denied. During closing argument, the defendant admitted liability for part of the plaintiff's moving expenses. The trial judge directed the jury to return a verdict for an amount found to be reasonable for moving expenses. After a verdict was returned in favor of the plaintiff, the defendant moved for a JNOV, which the trial court denied. On appeal, the defendant contended that the trial court had erred in refusing to direct a verdict and then in refusing to enter a JNOV. We affirmed, stating:
"It would have been improper for the trial court to grant the Housing Authority's motion for a directed verdict for the obvious reason that it would have been in diametric opposition to the Court's directed verdict for a portion of Malloy's claima claim which the Housing Authority expressly admitted."
Id. at 709.
This is the exact posture taken by Associates here. The trial court did not err in refusing to enter a JNOV on the issue of liability. In addition to the admission in the closing argument, the evidence supports the jury's finding of liability. First, it is undisputed that Associates' initial statements to the Barbours, that they were six months behind on their note, that they were going to have to leave the property, and that Associates was going to foreclose on the property, were false. Second, Associates falsely represented to the Barbours that they would get a good title if they assumed Henley's mortgage. Third, Associates prepared the warranty deed from Henley knowing that Henley did not have title to transfer. Fourth, Associates allowed the Barbours to assume a mortgage containing a provision for a balloon payment without disclosing that provision. Fifth, Associates did not disclose the fact that the Barbours were assuming a mortgage for $4,500 more than they had originally contracted to pay Henley. Sixth, Associates prepared, and gave, the Barbours a warranty deed from Henley conveying property that was subject to two judgment liens against Henley, that clouded the title to the property. Finally, Associates had the Barbours assume the payment of a $2,100 real estate commission that was attributable to another transaction. Rule 15(b), A.R.Civ.P., provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Issues concerning all of the facts just discussed were tried by the express or implied consent of Associates. We have reviewed all the evidence in the record and find that it amply supports the jury's finding of fraud.
Associates raises five separate evidentiary issues that it claims require a new trial. Associates contends that the trial court erred (1) in admitting three internal audits conducted by Associates concerning the activities of the Mobile office where Knight was in charge; (2) in permitting the plaintiffs' counsel to cross-examine and impeach a defense witness by mere reference to an affidavit of a deceased witness; (3) in refusing to allow Associates to introduce evidence of wealth by showing that Mr. Barbour had recovered a large money judgment in an unrelated personal injury action; (4) in permitting the plaintiffs' counsel to make certain arguments to the jury concerning Associates' failure to convey title to both lots involved; and, (5) in allowing the plaintiffs to introduce evidence concerning a third-party claim filed by Associates.
Three internal audits, conducted in 1984, 1986, and 1987, which detailed all of the insufficiencies located by the auditor with respect to Associates' Mobile branch, were admitted into evidence. The Barbours' transaction is mentioned in the 1987 *195 audit. A reference to Knight by name appeared in the 1987 audit. The 1987 audit contained the Milsaps' transaction which involved Knight and Leon Smith. In that transaction, Knight had arranged for Associates to lend money to an attorney, which the attorney used to compensate a purchaser. The purchaser claimed to have been damaged by improper performance of repairs performed for Associates by Leon Smith. Knight then wrote off the loan. Leon Smith was also the recipient of a $2,100 fee in the original sale from Associates to Henley.
In Lockhart v. Robbins, 386 So.2d 424 (Ala.1980), the Court held that where a party initially objects to the admission of testimony, but later introduces evidence detailing the same facts and circumstances contained in the objected-to testimony, he thereby waives any right to later complain on appeal. The subject audits were admitted by the Barbours during the testimony of Associates' representative, Al Waldrop. The record reveals that defense counsel himself questioned Waldrop extensively about the audits in an attempt to bolster Associates' defense. Defense counsel had anticipated his own use of the audits during his defense by using photographic enlargements of the audit report forms. The 1984 audit pointed to 17 "audit points" or policy violations, including a number of major policy/procedural violations. A follow-up memorandum authored by the auditor reads:
"As you suspected, there has been some deterioration in the overall detail of this branch, although the number of repeats have actually reduced from 19 on the previous audit to 17 on the present visit. A number of Major Policy/Procedural Violations remain...."
Testimony that was given by Allen Waldrop, a long-time vice-president and auditor for Associates, testified that "there were some problems [with] the way the branch was being run." The 1984 audit showed that loans were "being signed and funds being disbursed without loan papers being filled out or the customer's receiving copies of the documents." The 1984 audit revealed the same sort of problems that the Barbours encountered. That audit indicated that Knight had failed to file two deeds prepared by the title attorney, and therefore the audit was admissible to prove that Knight engaged in a common scheme, pattern, or practice of failing to file loan documents.
The 1986 audit was a limited audit concerned with real estate documentation only. This audit revealed that as to 4 of the 15 real estate accounts examined funds had been disbursed prior to the filing of the mortgage; that 5 of the 15 loans had not had an inspection done; that 10 of the 15 loans did not have a date of inspection documented on the inspection report; and that as to 2 of the 15 loans liens had not been cleared.
A follow-up memorandum shows that the auditors were concerned with Knight's failure to comply with procedures. In the memorandum, an Associates employee wrote:
"Attached find letter from David Francis answering the above audit on Mobile Tillmans Corner. Based on his findings I'd like to close the audit, however by means of a copy of this letter to David Francis, I am requesting that he re-visit this branch in 60 days and not less than 30 days and verify that Elliot Knight is complying in all areas."
The 1987 audit was a general audit specifically requested by a division manager for Associates. The audit revealed that Knight was "manipulating delinquencies" and had "charged off" a loan with no authorization from his superiors. The audit also revealed that Knight and Henley had been engaged in an identical transaction with a man named Kenneth Canton. The audit reads:
"It was noted that two accounts, Barbour and Canton, had documents in the folders signed by Jerome Henley, a broker with whom we sometimes do business. Both loans were approved to be made to Jerome Henley and on his strength as a borrower. After the closings the names were changed to Kenneth Canton and Oliver Barbour. The loans *196 were carried as contract for deed to Barbour and Canton and Oliver Barbour has since sued the Associates for not having a warranty deed and for not clearing liens from the title so Mr. Barbour could sell the property."
The Barbours sought admission of these audits based on the following grounds: (1) notice to Associates of the irregularities in documentation policy committed by the office managed by Knight; (2) notice to Associates that Knight was incompetent to handle real estate transactions; (3) to prove that Knight had been fired by Associates following the 1987 audit; and, (4) to prove a scheme, pattern, or practice, and intent. In HealthAmerica v. Menton, 551 So.2d 235, 245 (Ala.1989), we held that "in fraud actions, great latitude is allowed in the scope of evidence introduced.... Questions of materiality, relevance, and remoteness of evidence are matters resting within the discretion of the trial court, whose exercise of that discretion will not be reversed unless it has been grossly abused." In Georgia Cas. & Surety Co. v. White, 531 So.2d 838 (Ala.1988), we held that evidence of similar fraudulent acts was admissible to prove an alleged fraudulent scheme. In White, we cited Great American Ins. Co. v. Dover, 221 Ala. 612, 130 So. 335 (1930), in which this Court stated that "evidence of fraudulent transactions by the same party and substantially of the same character, contemporaneous in point of time, or nearly so, is admissible to show fraud in respect to a matter wholly distinct from the previous transaction."
The 1984 audit revealed that Knight breached Associates' policy regarding the filing of documents. The 1984 audit also revealed that Knight's superior "suspected" a deterioration in the "overall detail" of the Mobile branch. The 1986 audit revealed that Knight had approved two real estate loans on which liens had not been cleared. The 1987 audit contained information dealing directly with the Barbours' loan. The 1987 audit revealed as well that Knight and Henley had been engaged in a transaction identical to the Barbours' with a man named Kenneth Canton. Therefore, the audits reveal a scheme, pattern, and practice by Knight as well as evidence that Knight had been involved in similar transactions with Henley.
In Kabel v. Brady, 519 So.2d 912 (Ala. 1987), a patient brought a fraud action against his chiropractor, alleging that the chiropractor had misrepresented that the cost of an examination would be covered by Medicare. After the patient received a $162,500 jury verdict, the chiropractor appealed, contending that the trial court had erroneously admitted evidence that other patients had complained about the chiropractor's misrepresentations involving Medicare. Holding that the trial court did not err, we said:
"Although past dealings of a party with a nonparty are normally excluded as irrelevant, this prior conduct becomes competent evidence when the intent of the party is in issue. Roberson v. Ammons, 477 So.2d 957 (Ala.1985). In a fraud action, the `intent, knowledge and scienter constitute essential elements of the offense, [and] evidence of similar frauds and misrepresentations [is] commonly admissible.' Dorcal [, Inc. v. Xerox Corp.], 398 So.2d [665] 671 [Ala.1981], citing Roan v. Smith, 272 Ala. 538, 133 So.2d 224 (1961); Johnson v. Day, 230 Ala. 165, 160 So. 340 (1935); and 37 Am. Jur.2d Fraud & Deceit § 456 (1968).
"`... The Alabama courts generally agree that evidence of other fraudulent transactions or deceit by the civil defendant is admissible to show fraud, motive, scheme or intent.' C. Gamble, McElroy's Alabama Evidence, § 70.03(1) (3d ed. 1977)."
Id. at 918.
Associates next contends that the trial court committed reversible error by allowing the plaintiffs' counsel to cross-examine a defense witness, Leon Smith, using the affidavit of a deceased person. Associates contends that it was "inadmissible hearsay and cannot be offered as substantive evidence." An affidavit is inadmissible hearsay and cannot be offered as substantive evidence. State ex rel. Bailes v. Guardian Realty Co., 237 Ala. 201, 208, *197 186 So. 168 (1939); McClellan v. State, 452 So.2d 909 (Ala.Crim.App.1984); C. Gamble, McElroy's Alabama Evidence § 260.01 (4th ed. 1991). While the reading of the affidavit should not have been allowed by the trial judge, we believe that it was harmless error. We have carefully examined the record in this case and have determined that the admission of the affidavit did not injuriously affect the substantial rights of the parties and did not result in a denial of substantial justice to the complaining party. Rule 45, A.R.App.P., and Rule 61, A.R.Civ.P.
The defendant's next contention is that the trial court erred in refusing to allow Associates to prove wealth by showing that Mr. Barbour had recovered a $450,000 judgment in an unrelated lawsuit on January 6, 1987. The only authority cited to support this proposition is McElroy's Alabama Evidence § 189.05(2)(c). We hold that the exception cited in McElroy's is not applicable, because Mr. Barbour's wealth or poverty was never injected into the case. A review of the record shows us that Mr. Barbour was simply explaining why he had decided to sell his house to his son and was explaining how Associates' fraud had caused him mental anguish. Mr. Barbour's reference to his workmen's compensation payments being cut off was his way of explaining why he decided to sell the property:
"Q. What were the circumstances arounddon't say what anybody said but how did you happen to do a title check or somebody do a title check about a year later?
"A. Well, I got to where I was getting [worker's compensation] and I was paying these checks, and they cut my [compensation] out. And I couldn't pay it and my son Eric told me, he said, `Daddy I'll take it if I can get it refinanced and I'll take it.' And he got it refinanced"
A party must carry a heavy burden of proof before evidence of wealth may be admitted. Ashbee v. Brock, 510 So.2d 214 (Ala.1987). Associates has failed to demonstrate why this evidence should have been admitted.
Next, Associates contends that the trial court committed reversible error by permitting the plaintiffs' counsel to argue in the closing argument that if Associates was going to make delivery of the deeds to the Barbours' property during trial, the very least Associates could have done was to provide the Barbours with deeds to both properties involved. The trial court committed no error in allowing the arguments. Every transaction involved in this case involved both lot 12 and lot 20. By operation of Rule 15(b), A.R.Civ.P., pleadings are automatically amended to conform to the evidence when issues are tried by the express or implied consent of the parties. Although Associates objected to the argument of the plaintiffs' counsel, Associates did not request a curative instruction and did not move for a mistrial. Therefore, Associates has failed to preserve this issue for appeal. Harley-Davidson, Inc. v. Toomey, 521 So.2d 971, 973 (Ala.1988).
Associates next contends that the trial court erred in allowing the jury to hear evidence of a third-party claim that had been dismissed prior to the trial. After careful review of the record, we find it clear that the plaintiffs' counsel mentioned Associates' third-party claim in his opening statements without any objection from Associates. Thereafter, defense counsel himself went into a long discussion about how Associates blamed Preferred Research ("Preferred") and Richard Sawyer for failing to get the Barbours' deed recorded. Defense counsel even promised the jury in his opening statement that he would explain in his closing arguments why he "let Preferred Research go," and he did. From the outset of the case, defense counsel intended to defend Associates' conduct by blaming Preferred. Consequently, Associates cannot complain about the fact that its third-party claim against Preferred was revealed to the jury. Because Associates injected this issue into the trial, it has no right to complain. Glisson v. City of Mobile, 505 So.2d 315, 319 (Ala.1987).
After the jury returned its verdict, the plaintiffs filed post-judgment interrogatories *198 seeking information concerning Associates' financial position and the availability of liability insurance. In response to the post-judgment interrogatories, Associates filed an objection on the following grounds:
"[S]aid postjudgment discovery is irrelevant in that said Defendant waives the ground of the `financial position of the Defendant,' one of the factors enumerated in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), insofar as this Court's consideration as a factor warranting a remittitur in favor of Associates in this cause and hereafter the Supreme Court of Alabama if the cause ultimately reaches that Court."
As noted by the trial court in its order requiring a hearing pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), by filing this objection Associates "expressly waived any consideration by the Court of any impact that the jury's verdict will likely have on the defendant." The trial court properly noted that, "In light of defendant's waiver, this court must assume that the jury's verdict will have very little or no economic impact upon the defendant."
Under these circumstances, Associates is not entitled to a remittitur. The instant circumstances are indistinguishable from those involved in Fuller v. Preferred Risk Life Ins. Co., 577 So.2d 878 (Ala.1991). In Fuller we noted:
"When the jury returned its verdict, Preferred Risk filed its motion for a new trial, a judgment notwithstanding the verdict, or a remittitur. Preferred Risk argued only that, because the verdict exceeded the amount claimed in the complaint, it was due to be reduced. It did not offer any evidence in support of its contention that the verdict was excessive, and instead argued that it was entitled to a reduction of the verdict as a matter of law.
"Even after the plaintiff offered evidence in support of her contention that the verdict was not excessive, Preferred Risk declined to produce any evidence to the contrary. Preferred Risk responded to the plaintiff's post-verdict interrogatories by stating that the jury verdict `would not significantly impair their ability to operate.' Thus, it makes no claim that the verdict deprives it of its property without due process of law under § 13 [Ala.Const. of 1901].
"This Court observed in Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988), as follows:
"`Nothing prevents the defendant, at a hearing on a motion for new trial based on an allegedly flawed jury verdict, from presenting evidence to prove one or more of the above considerations [Hammond factors], and, by doing so, to guarantee that his right to due process of law in regard to the jury's award is protected. In sum, "fundamental fairness" requires that defendant be given the opportunity to present proof to the trial court during post-judgment review of the verdict that the award is unreasonable, disproportionate, or economically destructive....'
"547 So.2d at 838. Preferred Risk had this opportunity and elected to present no evidence at all.
"... The record is devoid of any evidence that would justify interference with the verdict under the criteria established in Hammond, Green Oil Co. [v. Hornsby, 539 So.2d 218 (Ala.1989)], and their progeny."
Id. at 885-86.
Like the defendant in Fuller, supra, Associates was given the opportunity to present evidence concerning the factors identified by this court in Hammond and Green Oil Co., yet Associates consciously elected not to do so. The trial court was presented no evidence concerning Associates' financial position, the availability of liability insurance, the existence of other civil litigation, criminal sanctions, or profit derived from real estate transactions. In the absence of such evidence, as noted by the trial court, "the court is in no position to evaluate or consider these factors." McDowell v. Key, 557 So.2d 1243, 1249 (Ala.1990).
*199 Therefore, the trial court had to review the evidence of record and conduct a comparative analysis of similar cases in evaluating Associates' excessiveness claim. After comparing the instant verdict with verdicts upheld by this Court in 10 specifically enumerated bad faith and insurance fraud cases, the trial court concluded that "it does not appear that the jury's verdict in the instant case is out of line with jury verdicts returned and affirmed in similar cases." Under these circumstances, the trial court correctly refused to remit the jury's verdicts.
Associates contends that the United States Supreme Court's opinion in Pacific Mutual Ins. Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), requires that a punitive damages verdict not exceed "a multiple of between four and five times" the amount of compensatory damages. Associates urges us to read Haslip literally to require that punitive verdicts may never exceed a "multiple four or five times" compensatory damages. We decline to do so.
The essential purpose of punitive damages would be thwarted if we required that they conform to any mathematical equation. In Rideouts Brown Service, Inc. v. Holloway, 397 So.2d 125, 127 (Ala. 1981), we said that for punitive damages to be effective the amount of damages "ought to be large enough to hurt. It ought to sting in order to deter, that is its purpose." In Nationwide Mutual Insurance Co. v. Clay, 525 So.2d 1339 (Ala.1987), we rejected this contention:
"Nationwide argues that punitive damages should bear some particular mathematical relationship to compensatory damages. However, we have repeatedly held that punitive damages need not necessarily bear any particular relationship to compensatory damages. U-Haul Company, of Alabama v. Long, 382 So.2d 545 (Ala.1980). We have said that decisions on punitive damages must be made on a case-by-case basis, and it is clear from our cases that this Court is willing to uphold substantial jury awards for damages, even in excess of $1,000,000 when the facts warrant such an award."
Id. at 1344. Therefore, we are not willing to adopt the proposition that punitive damages must be mathematically proportionate to the compensatory damages awarded.
There being no grounds for reversing, the judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.

ON APPLICATION FOR REHEARING
SHORES, Justice.
APPLICATION OVERRULED; OPINION MODIFIED.
HORNSBY, C.J., and MADDOX, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.