832 So.2d 25 (2001)
ORKIN EXTERMINATING COMPANY, INC., and Bill Maxwell
v.
Robert JETER, as representative of the estate of Artie M. Jeter.
Robert Jeter et al.
v.
Orkin Exterminating Company, Inc., and Bill Maxwell.
1000710, 1001077, and 1000916.
Supreme Court of Alabama.
November 9, 2001.
*29 M. Christian King and Stephen J. Rowe of Lightfoot, Franklin & White, L.L.C., Birmingham; D. Taylor Flowers of Lewis, Brackin, Flowers & Hall, Dothan; and Robert Simms Thompson, Tuskegee, for appellants/cross appellees Orkin Exterminating Company, Inc., and Bill Maxwell.
J. Michael Rediker, Patricia C. Diak, and Michael C. Skotnicki of Haskell, Slaughter, Young & Rediker, L.L.C., Birmingham; Stephen T. Etheredge and Lexa E. Dowling, Dothan; Jock M. Smith of Cochran, Cherry, Givens & Smith, P.C., Tuskegee; Rufus R. Smith, Dothan; and L. Andrew Hollis and Steven W. Couch of Pittman, Hooks, Dutton & Hollis, P.C., Birmingham, for appellee/cross appellant Robert Jeter, as personal representative of the estate of Artie M. Jeter.
LYONS, Justice.
On May 14, 1999, Artie Mae Jeter sued Orkin Exterminating Company, Inc. ("Orkin"), Bill Maxwell (a former Orkin employee), and several fictitiously named defendants, alleging breach of contract, fraud, and negligence. Mrs. Jeter died on December 4, 1999, while the action was pending. Her son, Robert Jeter, in his capacity as executor of his mother's estate, was substituted as the plaintiff. On June 5, 2000, the complaint was amended to add as plaintiffs, Robert Jeter, individually; William Jeter; and Edward Jeter. The trial court dismissed (1) the estate's negligence claim, (2) the estate's breach-of-contract claim against Maxwell, and (3) the individual claims of Robert Jeter, William Jeter, and Edward Jeter. The estate's breach-of-contract claim against Orkin and its fraud claims against Orkin and Maxwell were submitted to the jury. The jury returned a verdict against Orkin and Maxwell and in favor of the estate for $800,000 in compensatory damages and $80,000,000 in punitive damages. The trial court remitted the compensatory-damages award to $400,000 and the punitive-damages award to $4,000,000. The estate accepted the remittitur, and the trial court entered a judgment against Orkin and Maxwell. Orkin and Maxwell appeal from the final judgment; the estate cross-appeals from the trial court's remittitur of the damages awards.

I. Factual Background
The evidence, viewed in the light most favorable to Mrs. Jeter's estate, provides the following facts. In 1977, Orkin employee Willie Thomas inspected Mrs. Jeter's home. Thomas found minor termite damage to one portion of the home and mildew damage associated with a moisture problem. Based on Thomas's inspection, Mrs. Jeter purchased from Orkin a subterranean-termite-treatment contract; the contract provided a lifetime termite damage repair guarantee and retreatment bond. The bond provided up to $100,000 in repair costs for any new termite damage discovered after the initial termite treatment.
At the time of the initial treatment, it was Orkin's policy to create a graph documenting the extent of termite damage that existed before treatment. The bond covered any termite damage that did not appear on the graph, and that therefore must have occurred subsequent to Orkin's termite treatment. However, neither Orkin nor Mrs. Jeter had a copy of the graph documenting the initial termite damage to Mrs. Jeter's home; thus, Orkin is unable to distinguish between termite damage that occurred before the 1977 treatment and termite damage that occurred after.
The subterranean-termite-treatment contract that Mrs. Jeter purchased from Orkin also required Orkin to perform annual *30 reinspections of her home to determine if there were any new termite infestationsas to which Orkin would be liable under the contract for any necessary repairs to the home. If new termite damage was discovered during such a reinspection, Orkin would inform its customer by reporting the new termite damage on its reinspection report. Although Orkin should have performed the first reinspection of Mrs. Jeter's home in 1978, there is no evidence in the record indicating that Orkin performed a reinspection that year. Orkin reinspected Mrs. Jeter's home in 1979 and in 1980 and informed Mrs. Jeter that it found no active termites. In May 1981, Orkin retreated Mrs. Jeter's home for termites, even though Orkin represented on its report that no live termites had been found in the reinspection. Again, after this treatment, there is no evidence indicating that Orkin documented any termite damage to Mrs. Jeter's home by creating a graph.
In 1982 Orkin again retreated Mrs. Jeter's home. In 1982 and 1983, Orkin reinspected Mrs. Jeter's home and reported no live termites. In August 1984, Clency Bowman, a termite inspector for Orkin, inspected Mrs. Jeter's home and reported "heavy" damage to the structures supporting sills, floor joists, and foundation walls. Bowman did not report the damage to Mrs. Jeter because, according to Bowman, Orkin had in place a policy pursuant to which an inspector could not inform a homeowner of any termite damage to the home. Because Bowman was concerned about the termite damage to the home, but could not tell Mrs. Jeter that the damage was caused by termites, Bowman told Mrs. Jeter that she needed floor supports and a moisture-barrier treatment, both of which Mrs. Jeter purchased from Orkin; Orkin charged her for providing the floor supports and the moisture barrier.
In 1985, 1986, and 1987, Bowman reinspected Mrs. Jeter's home for termite damage. Although Bowman found termite damage, he reported to Mrs. Jeter that there was no evidence of termite damage and no evidence of moisture damage. In May 1988, Mrs. Jeter found termites swarming all over her house; she immediately contacted Orkin. Bowman reinspected and retreated Mrs. Jeter's home, reporting to Mrs. Jeter for the first time the termite damage. Bowman noted on his reinspection report that there was "[e]xtensive termite damage to about 90% of structure [and] [t]ermite swarmers in bathrooms." Because of Orkin's policy of not discussing termite damage with the homeowners, Bowman did not provide Mrs. Jeter with a copy of his report.
Bowman gave a copy of the report to his branch manager, Bill Eady. Eady filled out a customer-grievance report on Mrs. Jeter's home; the report indicated "[d]amage very evident." In addition, he reported the nature of the problem as "[e]xtensive termite damage to interior walls in 2 bathrooms & 2 other rooms in the house plus sills underneath." Recognizing that Orkin might be liable for repairs to the house caused by the termite damage, up to $100,000, Eady contacted Maxwell, a district manager for Orkin.
Maxwell visited Mrs. Jeter's home and saw the termite damage. Despite Bowman and Eady's findings to the contrary, on November 9, 1988, Maxwell drafted a document stating that the bathroom in Mrs. Jeter's home had "no visible signs of termite damage" and that the damage to Mrs. Jeter's bathroom could be either termite damage or water damage and that Orkin would not be responsible for repairing the damage if it was found to be caused by water. Maxwell had Mrs. Jeter sign this document. Although Maxwell suggested to Mrs. Jeter that she might be *31 responsible for paying for the repairs to her bathroom, at the same time, Maxwell and Eady sought bids to determine how much it would cost to repair the damage to Mrs. Jeter's home. Maxwell received at least two bids, one for $28,826 and one for $16,800, both of which his supervisor, Stan Olstein, rejected because, according to Olstein, the bids were too high.
Orkin subsequently employed a carpenter named Hastings to open up the floors and walls of Mrs. Jeter's home to determine the source and the extent of the damage. On December 2, 1988, after the floors and walls of Mrs. Jeter's home had been opened up, Maxwell prepared another document that he had Mrs. Jeter sign. In that document, he agreed that Orkin would pay $400 to repair the damage to Mrs. Jeter's bathroom. In the document, Maxwell acknowledges minor termite damage, but states in the same document that water leakage was the cause of problems in her bathroom, that her floor joists were in perfect condition, and that termite damage was not the cause of her sagging floor.
The record suggests that Maxwell was in continuous contact with his supervisor, Olstein, regarding Mrs. Jeter's termite damage. Sometime before December 12, 1988, Maxwell was demoted from his position as district manager. According to Maxwell, he was demoted because Orkin believed that he was spending too much money to repair Mrs. Jeter's home. Jim Turner replaced Maxwell; Turner subsequently took over Mrs. Jeter's file. Maxwell informed Turner of the situation regarding Mrs. Jeter's claim, and Turner asked Maxwell, who was still employed by Orkin, to write a memorandum that he could use to persuade Olstein to act on the claim. On December 12, 1988, Maxwell wrote an interoffice memorandum to Turner explaining the damage to Mrs. Jeter's home. In the memorandum, Maxwell wrote:
"1. I used a small hammer and could bury it in every sill plate in the home....
"2. 25% of all floor joists are damaged severely....
"3. 33% of the floor had serious termite damage.
"....
"7. We sold her a moisture and jack job in December, 1984. We installed 56" 4 × 4 under 3 floor joists which are 24" on center. These were installed to support severely damaged floor joists....
"....
"Our inspection inside the house revealed damaged wall studs in three different areas.... Most of the floors in the house are spongy and sloping....
"The only way to repair this house properly would be to cut the floors away about three feet from every outside wall to give you working room to replace sills. In doing this all damaged wall studs would be exposed and at least 33% would need to be replaced. Since about 25% of the floor joists are severely damaged, this would require possibl[y] removing some floor which would reveal all damaged subflooring.
"If you tried to do the above, you could build a new house cheaper and quicker. The sills which [are] the main support of this house are completely destroyed and if the added block supports and our jacks were not under the house, it would simply start to break apart.
"You have three choices:
"1. Build a new house.
"2. Spend thousands trying to fix [an] unfixable house.
"3. Put more support under the house to keep it from falling down.

*32 "....
"Consider the following facts:
"....
"7. ... The contractor is black and known to her which gives her confidence in his recommendations. The way I proposed will really keep the house from falling down and enable the contractor to raise sunken floors but in no way is repairing termite damage. You simply cannot repair the termite damage in this house.
"8. To my knowledge, no one has really told he[r] the true extent to which her house is infested.... We took her money and never really told her the truth about the serious termite problem. On Dec. 9, 1988, and in front of Mr. Hastings, the contractor, I did tell her the truth about her sills and floor joists. Mr. Hastings backed up my statement and my [proposed] method of preventing her house from falling down....
"....
"She is starting to trust me and I have treated her with respect and have gained the confidence of the contractor involved. If we get her angry enough to call in the State Inspector or to contact any attorney who will have a contractor look at her house, the odds of the following happening are 99%.
"1. We will build her a new house.
"2. Pay over $100,000 in punitive damages.
"3. Thousands in attorney's fees.
"Ms. Jeter is 78 years old, black, in poor health, no money, we do not have a graph, her house was improperly treated, we sold her twice with no documentation of existing conditions, home is badly eaten up by termites to the point of breaking apart....
"....
"... [W]e can spend $5000 now and have her put in small claims over the years until she dies and her children sell the house, or if any attorney get[s] involved, we will probably buy her a new house, thousands in punitive damages and attorney fees."
In addition to the revelations regarding the extent of termite damage to Mrs. Jeter's home quoted above, the memorandum also contains evidence indicating that Maxwell had attempted to completely cancel Mrs. Jeter's contract with Orkin and that Maxwell had attempted to make cash settlement offers to Mrs. Jeter. On the same day Maxwell drafted the above memorandum to Turner, in which he described the damage to Mrs. Jeter's home, Maxwell drafted an agreement for Mrs. Jeter to sign. The agreement indicated that Orkin would pay $4,660 for repair work to Mrs. Jeter's home but it did not describe the extent of termite damage to her home as Maxwell had described in his memorandum to Turner. Maxwell had Mrs. Jeter sign this agreement. Although Maxwell testified that he had discussed the extent of termite damage with Mrs. Jeter, Mrs. Jeter stated in her deposition that Maxwell never told her that her home was "unfixable" and that he did not tell her the extent of the damage to her home, as described in the memorandum. In 1989, after several months of repair work and several contractors, Orkin represented to Mrs. Jeter that the termite damage to her home had been repaired. Mrs. Jeter never saw the interoffice memorandum describing the extent of the termite damage to her home until March 1999, when the memorandum was produced by Orkin in connection with another lawsuit.

*33 II. Waiver of Defenses to Liability

Orkin and Maxwell (hereinafter collectively referred to as "the Orkin defendants") contend that the judgment in favor of Mrs. Jeter's estate should be reversed because, they argue, the applicable statutes of limitations bar the estate's breach-of-contract and fraud claims. The Orkin defendants also contend that the trial court erred in refusing to grant their motion for a judgment as a matter of law ("JML") because, they say, the estate failed to present any evidence indicating that Mrs. Jeter relied to her detriment on the fraud. Finally, Orkin contends that the estate did not have standing to pursue the breach-of-contract claim because, they say, Mrs. Jeter did not own the property at the time this action was filed.
The estate counters by arguing that the Orkin defendants waived these defenses by admitting liability in their closing argument before the jury. We agree. In closing argument, the attorney for the Orkin defendants stated:
"You have the power today to either pronounce a verdict of atonement, which means to satisfy a wrong; or, crucifixion. I am here for atonement. They are here for crucifixion.
"I know my county. Y'all ain't going to return no defense verdict. This is going to be a plaintiff verdict. I'm going to tell you that right now. You are going to award a sum of money to Robert, Edward, and William. Period. I ain't going to stand up here and insult your intelligence by telling y'all, this is a defense case, and Orkin didn't do anything wrong. I'm not going to tell you. I'm not going to insult your intelligence. I'm not going to do it. But, again, I speak of atonement versus crucifixion.
"Now ain't nobody all right; ain't nobody all wrong. Orkin has got some problems. Defense case has got some problems....
"....
"... So, I'm not going to ask you to turn Orkin loose. I want you to return a verdict against Orkin. I agree with that. I've already said you are going to return a verdict against Orkin....
"....
"You are talking atonement; not crucifixion. I'm going to give you a number. I'm going to recommendIf I get shot in the back you know it came from Orkin. My back is going to be turned when I give you this number.... But, I can't stand up here and tell you that Orkin has done wrong and has not been honest and then not tell you what I think you ought to do about it. ...
"....
"Ladies and gentlemen, today is Orkin's day of trespass. This is their day of atonement. The principal is a hundred thousand dollars. That's the amount of the termite bond they should have stood behind and didn't. This is one isolated case. If they had shown me they had done it more, then we would start multiplying each time.... I am not going to stand up here and argue the law of the statute of limitations. If you find the statute of limitations, she knew that in a certain period of time, you know, she didn't havebut y'all ain't goingI'm not wasting my time.... But something happened out there and that house was eaten up. That's the trouble. Atonement. They ain't proved two or three million. Atonement. Five hundred thousand is a just and fair verdict in this case."
(Emphasis added.)
The Orkin defendants, in their closing argument, expressly admitted wrongdoing to the jury and invited a verdict for the estate. Rather than argue that the statute *34 of limitations barred recovery in the case followed by a statement to the effect, "If you should not agree with me on this issue, then let me explain to you what I think a fair award of damages should be," the Orkin defendants affirmatively disavowed the statute-of-limitations defense and expressly admitted liability. This Court has found admissions of liability in closing arguments to waive subsequent arguments against liability. Associates Fin. Servs. of Alabama, Inc. v. Barbour, 592 So.2d 191, 193-94 (Ala.1991); Housing Auth. of the City of Prichard v. Malloy, 341 So.2d 708, 709 (Ala.1977). In Associates Financial Services of Alabama, as here, the defense attorney admitted during closing argument that the defendant would "like to correct the situation" and that the defendant was "responsible for what [its employee] did [defrauding a customer]." 592 So.2d at 193. The defense attorney also admitted to the jury that the defendant was bound to pay compensatory damages if the jury awarded any. Id. In Associates Financial Services of Alabama, this Court concluded that the closing argument contained a direct admission of liability and that the trial judge had not erred in refusing to enter a directed verdict (renamed a preverdict JML, see Rule 50, Ala. R. Civ. P.). for the defendants on the issue of liability. Id. at 194.
Similarly, in Housing Authority of the City of Prichard, the defendant admitted during closing argument liability for one of the plaintiff's claims. 341 So.2d at 709. The trial court thereafter directed the jury to return a verdict for the plaintiff on this claim in an amount it found to be reasonable under the evidence. Id. The defendant argued on appeal that the trial court erred in denying its motion for a directed verdict. Id. This Court stated:
"It would have been improper for the trial Court to grant The Housing Authority's motion for a directed verdict for the obvious reason that it would have been in diametric opposition to the Court's directed verdict for a portion of [the plaintiff's] claima claim which the Housing Authority expressly admitted."
341 So.2d at 709.
Likewise, it would have been improper in this case for the trial court to grant the Orkin defendants' postjudgment motion for a JML when the Orkin defendants went far beyond mere expressions of opinion, indeed went so far as suggesting a proper amount of damages the jury should award. The Orkin defendants admitted liability with the following statements: "I ain't going to stand up here and insult your intelligence by telling y'all, this is a defense case, and Orkin didn't do anything wrong.... I'm not going to ask you to turn Orkin loose. I want you to return a verdict against Orkin. I agree with that.... But, I can't stand up here and tell you that Orkin has done wrong and has not been honest and then not tell you what I think you ought to do about it.... I am not going to stand up here and argue the law of the statute of limitations.... I'm not wasting my time." Such statements abandoned the defenses the Orkin defendants now ask us to embrace in order that they might avoid liability.

III. Damages for Mental Anguish

A. Mitigation

The Orkin defendants contend that the award of damages for mental anguish is improper because, they argue, Mrs. Jeter failed to mitigate her damages. The Orkin defendants claim that her mental anguish could have been reduced if: (1) Mrs. Jeter had hired an engineer to inspect her home to relieve her fears that it was unsafe, (2) Mrs. Jeter's attorneys had made her aware that Orkin had spent more than $23,000 on repairs to her home, and (3) her attorneys had not shown Mrs.
*35 Jeter the Maxwell memorandum. We find Orkin's mitigation-of-damages argument completely without merit. The trial judge instructed the jury on the issue of mitigation, stating that it was Mrs. Jeter's duty to exercise ordinary care to reduce her damages. We have no basis on which to conclude that the jury did not follow the judge's instruction. In addition, we have found no documents from Orkin's "Jeter file" documenting the total amount Orkin paid for repairs to Mrs. Jeter's home. Furthermore, Orkin had ample opportunity to communicate to Mrs. Jeter before she filed suit the total amount that it expended on repairs to her home. We especially find without merit Orkin's argument that Mrs. Jeter's attorneys "created and sustained her mental anguish" by showing her the Maxwell memorandum. To even consider that argument would reward an attorney for withholding information from a client in furtherance of a cover-up initiated by the adverse party.

B. Excessiveness

The jury returned a verdict against the Orkin defendants awarding $800,000 in compensatory damages. The trial court remitted the compensatory-damages award to $400,000. The trial court's order notes that $100,000 of the jury's compensatory-damages award was based on the $100,000 lifetime termite damage repair guarantee. The Orkin defendants have conceded that they should pay Mrs. Jeter the $100,000 promised by the termite guarantee; therefore, the Orkin defendants challenge only $300,000 of the $400,000 award. They contend that the award of $300,000 for mental anguish is excessive and is not supported by the evidence. The Orkin defendants claim that the evidence presented at trial of Mrs. Jeter's mental anguish was "exceptionally limited" and "failed to establish that her suffering rose to that level required" to support a $300,000 award for mental-anguish damages. On cross-appeal, Mrs. Jeter's estate argues that there was no basis for the trial court to invade the province of the jury and to remit the $800,000 compensatory award to $400,000.
Mrs. Jeter died before trial; she did not have the opportunity to tell the jury in her own words how she suffered emotionally from the Orkin defendants' wrongdoing. The jury instead heard testimony from her son, Robert Jeter, and her granddaughter, Artie Jeter Thompson, regarding the emotional distress Mrs. Jeter suffered before her death and after learning of the Maxwell memorandum. The testimony from those two witnesses indicated the following: Mrs. Jeter became very upset and angry that she had been betrayed by Maxwell and Orkin because they had not repaired her house as they were required to do under her termite bond. Mrs. Jeter would become frustrated and angry, and was heartbroken and hurt. Before learning the truth about how Orkin had treated her, she was happy, but once she discovered the truth, Mrs. Jeter lost her "fighting spirit" and began to worry that she might not live long enough to see justice. Mrs. Jeter felt that she had been taken advantage of and she would cry about the condition of her house. Sometimes she would not eat, and she lost interest in people and in going places. She became obsessed about the condition of the floor of her house and would test it by walking and stomping on it. Mrs. Jeter chose not have her family come to her house for what turned out to be her last Thanksgiving because she was concerned that the floor might cave in if she had too many people in her home at one time. In addition, Mrs. Jeter lost sleep and lay awake nights worrying about her house and listening for strange noises.
*36 Mrs. Jeter had also experienced difficulties with her home during her relationship with Orkin and caused by termite damage even before she became aware of the Maxwell memorandum. The evidence is undisputed that Mrs. Jeter's house deteriorated over a period of years, that she assumed responsibility for paying for floor supports and a moisture-barrier treatment, and that she endured a carpenter's opening up the floors and walls of her home and several months of repair work and changes in several contractors during the lifetime of her dealings with Orkin. However, any evidence beyond the mere recitation of such events and description of Mrs. Jeter's mental anguish during this period before she learned of the Maxwell memorandum is sketchy and inconsistent. The evidence reflected that she was almost in tears over her bathroom being torn up, was upset with Maxwell over attempts to cancel the lifetime guarantee, and worried over the competence of the carpenter. The quality of this evidence is demonstrably lower than that offered to support the claim of mental anguish covering the period after she became aware of the Maxwell memorandum. In fact, the estate's own witnesses testified that Mrs. Jeter was "happy" before she learned of the Maxwell memorandum.
While it is true that a trial court may not substitute its judgment for that of the jury when the jury has returned a compensatory verdict that is supported by the record, there are situations in which a trial judge "`may, and should, reduce or increase the amount of the verdict to reflect the amount to which the parties are entitled as a matter of law.'" Daniels v. East Alabama Paving, Inc., 740 So.2d 1033, 1043 (Ala.1999) (quoting Hammond v. City of Gadsden, 493 So.2d 1374, 1378 (Ala.1986)). First, a trial judge may modify a jury verdict that "`include[s] or exclude[s] a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence, where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure.'" Id. Second, a trial judge may modify a jury verdict when it "`results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive.'" Id. In addition to these two situations, in Kmart Corp. v. Kyles, 723 So.2d 572, 578 (Ala. 1998), we recognized an additional manner in which a jury verdict may be flawed. We held in Kmart that a jury verdict awarding damages for mental anguish was subject to strict scrutiny if the plaintiff had not suffered any physical injury and offered little or no direct evidence concerning the degree of mental suffering he or she had experienced. Id. We have recognized that a trial judge is in a better position to decide whether a verdict results from any such flaws. See Daniels, 740 So.2d at 1043; see also Hammond, 493 So.2d at 1378-79.
Our review of a jury verdict on the ground of the excessiveness of compensatory damages must focus on the plaintiff (as the victim) and ask what award the evidence supports in terms of the damage the plaintiff suffered. Daniels, 740 So.2d at 1044; see also Pitt v. Century II, Inc., 631 So.2d 235, 239 (Ala.1993). After reviewing the evidence presented of the emotional distress suffered by Mrs. Jeter, we conclude that a further remittitur of the compensatory-damages award is appropriate.
This Court has not hesitated to remit compensatory damages where there is a lack of evidence indicating that the plaintiff suffered significant mental anguish. See Alabama Power Co. v. Murray, 751 So.2d 494 (Ala.1999); Delchamps, Inc. v. *37 Bryant, 738 So.2d 824 (Ala.1999); Oliver v. Towns, 770 So.2d 1059 (Ala.2000); and Kmart Corp. v. Kyles, supra. We remitted awards for mental-anguish damages in Alabama Power, Delchamps, Oliver, and Kyles, not because of a lack of evidence indicating that the plaintiffs had experienced traumatic events, but because of the limited evidence presented by each plaintiff regarding the emotional distress he or she had suffered as a result of the traumatic event.
For instance, in Alabama Power, we remitted by $66,000 a husband's $132,000 award of mental-anguish damages, while affirming the mental-anguish damages award to his wife, because limited evidence was presented suggesting that the husband had suffered significant emotional trauma. 751 So.2d at 500-01. In Alabama Power, the plaintiffs' home and their possessions had been destroyed in a fire. The husband's evidence of mental anguish was limited to his testimony that he was "all shook up" and that "[i]t was hard." Id. at 500. Based upon the insufficiency of any evidence indicating that the husband had suffered mental anguish of the same nature, severity, and duration as had his wife, we remitted the husband's mental anguish award by $66,000. Id. at 501.
In Delchamps, the plaintiff alleged malicious prosecution. 738 So.2d at 827. In his testimony, he described his arrest, being taken to jail, and the humiliation he had endured. 738 So.2d at 836-37. We found that although the plaintiff presented substantial evidence indicating that certain events occurred, i.e., that he had been arrested, that he had been incarcerated for several hours, and that he was worried about the effect the arrest would have on his probation, he presented no testimony or other evidence indicating the gravity of his mental anguish. Id. The only evidence presented of the plaintiff's mental suffering was his testimony that dealing with the arrest and the subsequent prosecution was "hard" and that as a result of the arrest and prosecution he was "put through humiliation." Id. Based upon what we called "scant direct testimony" about his mental anguish, this Court remitted the plaintiff's award of mental-anguish damages from $400,000 to $100,000. 738 So.2d at 838.
Similarly, in both Oliver and Kyles we remitted the plaintiff's mental-anguishdamages award because of the lack of evidence suggesting that the plaintiff had suffered any emotional trauma. In Oliver, the plaintiff, who had been defrauded by her attorney, testified only that she suffered "a lot of [mental anguish]" and that she had to seek counseling because of her worry over losing the opportunity to buy a house. 770 So.2d at 1061. In Kyles, a malicious-prosecution case, the plaintiff offered even less evidence of mental anguish. We noted in Kyles that the only evidence presented of the plaintiff's alleged mental suffering was her husband's testimony that she had cried on one occasion. 723 So.2d at 577-78.
Contrary to Alabama Power, Delchamps, Oliver, and Kyles, the testimony in this case reveals that Mrs. Jeter endured significant mental anguish during the nine months between her learning of the Maxwell memorandum and her death. The evidence indicates the mental anguish suffered by Mrs. Jeter is comparable to that suffered by the plaintiff in Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala.2000). In Southern Energy Homes a homeowner sued a mobile-home manufacturer for breach of express and implied warranties in connection with his purchase of a mobile home. The plaintiff complained that when the mobile home was delivered, it had several deficiencies, including missing siding, damaged window trim, missing molding, loose carpet, loose *38 bathroom fixtures, loose and leaking entry doors, and a leaky roof. 774 So.2d at 510. In determining whether the jury's verdict of $375,000 in compensatory damages was excessive, we carefully reviewed the plaintiff's testimony regarding his emotional distress.
"[The plaintiff] testified that he felt bad and embarrassed when his friends came to see his home. He testified that the night before trial, he had to place garbage cans out to catch water leaking from the roof, and that he had previously done so on many occasions. He testified that he was embarrassed and that the purchase of his home had been a nightmare to him.... [H]is wife testified that when it rained [the plaintiff] became angry and that, as a result, they did not get along very well. She said that he would rather stay home than work to earn money to make his mortgage payment each month. The record also show[ed] that [the plaintiff] never missed a payment and that he dealt with these feelings for approximately five years."
Id. at 519. We concluded in Southern Energy that evidence indicating that the plaintiff had experienced such feelings over an extended period (five years) supported the jury's finding of mental anguish and its damages award. Id.
The evidence in this case concerning the nine-month period following the receipt of the Maxwell memorandum is of similar quality to that proffered in Southern Energy dealing with a five-year period and resulting in an award of $375,000. However, as previously noted, although the evidence concerning events occurring even before Mrs. Jeter learned of the Maxwell memorandum that could have caused mental anguish is significant, evidence of mental anguish that in fact resulted from those events is not nearly as compelling as the evidence offered relating to the period after Mrs. Jeter learned of the Maxwell memorandum. Evidence of the mere occurrence of an event, without evidence indicating mental anguish resulting from that event, does not justify a substantial award of damages for mental anguish. Delchamps, 738 So.2d at 837. If evidence of Mrs. Jeter's mental distress is viewed as based primarily upon the nine-month period from her awareness of the Maxwell memorandum until her death, the trial court's remitted award of $300,000 for mental anguish would equal approximately $1,000 per day, significantly more than the $375,000 compensatory-damages award we upheld in Southern Energy, a substantial portion of which was allocable to mental anguish over a period of five years.
This Court has recognized that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict awarding, or a trial court's judgment remitting, compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering. See Foster v. Life Ins. Co. of Georgia, 656 So.2d 333, 337 (Ala.1994). The testimony from Artie Jeter Thompson and Robert Jeter reveals that the Orkin defendants' fraudulent conduct caused Mrs. Jeter to suffer tremendously in the nine months before her death. However, the limited duration of Mrs. Jeter's suffering will not permit the entire remitted award of $300,000 for mental-anguish damages to survive strict scrutiny. We cannot allow strong feelings over the reprehensibility of a defendant's conduct, however justified, to drive up an award of damages for mental anguish. As we will discuss later, the ratio or amount of the multiplier used in computing punitive-damages awards is the *39 proper vehicle to address the reprehensibility of a defendant's conduct. We conclude that the trial court erred in remitting the award of compensatory damages to $400,000; an award of compensatory damages of $300,000 ($100,000 allocable to the amount of the bond, $200,000 attributable to damages for mental anguish before and after learning of the Maxwell memorandum) is appropriate, after applying strict scrutiny to the jury's initial award of $800,000. We therefore remit the compensatory damages to $300,000.

IV. Excessiveness of Punitive Damages
Finally, the Orkin defendants contend that even as remitted, the punitive-damages award of $4,000,000 in this case is grossly excessive and contrary to established law governing such awards. At trial, the jury returned a verdict of $80,000,000 in punitive damages in favor of Mrs. Jeter's estate. The trial court subsequently ordered a remittitur of the jury's punitive-damages award from $80,000,000 to $4,000,000. In its cross-appeal, Mrs. Jeter's estate argues that the trial court had no basis for the $76,000,000 remittitur of the punitive-damages award.
Recently, in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the United States Supreme Court addressed the question whether an appellate court should review a trial court's punitive-damages award by applying an abuse-of-discretion standard or by applying a de novo standard. Reasoning that the guideposts established in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("BMW"), "will acquire more meaningful content through case-by-case application at the appellate level," the Supreme Court held that "courts of appeals should apply a de novo standard of review when passing on [trial] courts' determinations of the constitutionality of punitive damages awards." Cooper Industries, 532 U.S. at 436, 121 S.Ct. at 1685-86. In Acceptance Insurance Co. v. Brown, 832 So.2d 1 (Ala.2001), we recently embraced that standard, holding that our review of a trial court's punitive-damages award is de novo.
In reviewing a punitive-damages award for excessiveness, this Court considers the "guideposts" established in BMW and the factors set out in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). See Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 978 (Ala.1998).

A. The BMW Guideposts

We begin with an analysis of the guideposts established by the United States Supreme Court in BMW.
1. The reprehensibility of the defendant's conduct.
"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575, 116 S.Ct. 1589. Although the Supreme Court did not provide any particular yardstick by which to measure reprehensibility, it did acknowledge that trickery and deceit are more reprehensible than negligence, and that acts of affirmative misconduct, such as making deliberate false statements, are more reprehensible than making innocent misrepresentations. Id. at 575-76, 116 S.Ct. 1589. The Supreme Court also recognized that economic damage inflicted upon a financially vulnerable plaintiff might well support a large punitive-damages award. Id. at 576, 116 S.Ct. 1589.
The record is replete with evidence indicating deceitful conduct by the Orkin defendants toward Mrs. Jeter, an elderly *40 widow with little formal education. It is difficult to imagine a more damaging internal memorandum than the one presented in this case. There is evidence that Orkin knew of the serious termite damage to Mrs. Jeter's home as early as 1984 and that it engaged in a policy of fraudulently concealing that damage. There is evidence that Orkin representatives deceived Mrs. Jeter into believing that she needed additional services such as a "moisture-barrier treatment" and "jack job" to preserve her home, when in fact her home had already been badly damaged by termites. Orkin charged Mrs. Jeter for these additional services when Orkin was already obligated under its contract with Mrs. Jeter to repair the termite damage to her home. There is substantial evidence indicating that in 1988, when the damage became evident even to Mrs. Jeter, the Orkin defendants misrepresented the extent of the damage and even developed a plan to convince Mrs. Jeter that most of the damage to her home was water damage, for which Orkin was not responsible. The evidence shows that Orkin's conduct was highly reprehensible.
2. The ratio of the compensatory-damages award to the punitive-damages award.
A second indicium of either the reasonableness or the excessiveness of a punitive-damages award is the ratio of the punitive-damages award to the actual harm inflicted upon the plaintiff. BMW, 517 U.S. at 580, 116 S.Ct. 1589. The guaranty of due process does not require that this Court apply a mathematical formula to determine whether a punitive-damages award is excessive; therefore, a remittitur generally is not justified solely on the basis of a high ratio. See Grissett, 732 So.2d at 979. The ratio between the compensatory- and punitive-damages awards must be reasonable; however, a higher ratio may be justified in cases in which the harm to the plaintiff is hard to detect or the monetary value of noneconomic harm is difficult to determine. BMW, 517 U.S. at 580-83, 116 S.Ct. 1589.
We discussed ratios in Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045 (Ala.2000), an opinion in which support can be found for applying as a benchmark a ratio of three times compensatory damages in a case where substantial compensatory damages have been awarded. (Houston, J., concurring specially.) Support can also be found for the more general concept of single-digit multipliers as a benchmark. (Lyons, J., concurring specially.) Regardless, a benchmark is just thatit can serve as a basis from which to adjust downward or upward, as appropriate. In this case, the remitted punitive-damages award of $4,000,000 is 10 times the compensatory-damages award of $400,000 remitted by the trial court. It is greater than 10 times the remitted compensatory-damages award of $300,000 ordered in this opinion. Because we consider the harm to Mrs. Jeter severe in this case, both because the Orkin defendants caused damage to her most valuable assether homeand because Mrs. Jeter was financially vulnerable and elderly, and the Orkin defendants' reprehensibility therefore high, we conclude that a higher ratio of punitive damages to compensatory damages is justified. However, in the face of the significant award of compensatory damages, the evidence in this case does not suggest that a ratio higher than 10:1 is warranted.
3. Sanctions for comparable misconduct.
The Alabama Deceptive Trade Practices Act, § 8-19-1 et seq., Ala.Code 1975, provides a $2,000 civil penalty for violation of the Act, provides for a private cause of *41 action and damages in the amount of three times "actual" damages, and provides for potential conviction of a Class A misdemeanor. Calculating a potential award under the Deceptive Trade Practices Act, given the facts of this case, would provide a punitive-damages award of $900,000.
4. Summary of the BMW analysis.
Our analysis of the BMW guideposts indicates that even after the trial court's remittitur, $4,000,000 is an excessive punitive-damages award.

B. The Hammond/Green Oil Factors

We now consider the factors established by this Court in Hammond and Green Oil.
1. The punitive-damages award and the actual or likely harm caused.
"`Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.'" Green Oil, 539 So.2d at 223 (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)). As a result of Orkin's conduct, Mrs. Jeter was induced to purchase, in addition to the annual renewal fees that she paid, additional services for termite protection that would not have corrected her existing termite problem. Orkin's failure to adequately inspect and repair the termite damage to Mrs. Jeter's home rendered her home worthless and entirely unsafe for habitation. However, we are not here dealing with loss of life or limb. Based upon these factors, we conclude that the degree of harm resulting from the Orkin defendants' conduct supports the imposition of significantly more than token punitive damages, but not damages that are excessive. This factor thus weighs in favor of a finding that the trial court's remitted punitive-damages award of $4,000,000 is excessive.
2. The reprehensibility of the Orkin defendants' conduct.
Although this factor is also discussed in our review of the BMW guideposts, in a Hammond/Green Oil review, we assess the reprehensibility of a defendant's conduct by considering "`[t]he duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct.'" Green Oil, 539 So.2d at 223 (quoting Lavoie, 505 So.2d at 1062). We note that this factor would permit a significant punitive-damages award for Mrs. Jeter's estate. The evidence in the record suggests that as early as 1978 Orkin breached its duty to adequately inspect Mrs. Jeter's home, and that in 1984 Orkin saw evidence of termite damage to Mrs. Jeter's home but did nothing to repair that damage until 1988. The Maxwell memorandum, as well as trial testimony from expert witnesses, indicated that the repair work performed by Orkin in 1988 was inadequate. Orkin's reprehensible conduct in regard to Mrs. Jeter's claim spanned almost 10 years. The evidence is overwhelming that Orkin actively engaged in a plan to deceive Mrs. Jeter about the condition of her home. It is clear that the scheme to deceive Mrs. Jeter spanned from lower level termite inspectors to a branch manager, a district manager, and a regional manager. In addition, there is evidence that Orkin engaged in a pattern of misconduct by failing to inform homeowners of termite damage for which Orkin would be liable to repair. The evidence of Orkin's reprehensible conduct overwhelmingly weighs in favor of a *42 finding that substantial punitive damages are appropriate.
3. Orkin's profit from its misconduct.
If the evidence reveals that the defendant profited from its wrongful conduct, we must consider whether the punitive-damages award removes that profit and whether it exceeds the profit so that the defendant recognizes a loss. Green Oil, 539 So.2d at 223. Orkin contends that it in no way profited from its inappropriate activities. Orkin claims that altogether over the years Mrs. Jeter paid between $2,902 and $3,848 pursuant to her contract with Orkin. Orkin claims that because it spent over $23,000 in repairs to Mrs. Jeter's house, it made no profit from its dealings with Mrs. Jeter. We disagree. The goal of Orkin's scheme to conceal Mrs. Jeter's termite damage was a direct result of Orkin's attempt to avoid liability on the $100,000 termite-damage repair guarantee. Because Orkin was able to avoid paying the full sum for which it was liable to Mrs. Jeter, Orkin's conduct produced an unjust gain. To the extent that Orkin may have profited, it is clear that the punitive-damages award not only removed any profit, it far exceeded it. This factor weighs in favor of a finding that the punitive-damages award is excessive.
4. The Orkin defendants' financial position.
This Court has made clear that a punitive-damages award should sting, but should not destroy a defendant. Green Oil, 539 So.2d at 222 (quoting Ridout's-Brown Service, Inc. v. Holloway, 397 So.2d 125, 127-28 (Ala.1981)). Although the evidence regarding the Orkin defendants' financial position was disputed, the record indicates that Orkin has a net worth of at least $41.5 million. The remittitur to $4,000,000 in punitive damages would therefore result in an award of approximately 10 percent of Orkin's net worth as damages for misconduct during a single transaction not involving loss of life or limb. Therefore, this factor weighs in favor of finding the punitive-damages award excessive.
5. Costs of litigation.
In a Hammond/Green Oil review, we must consider whether the punitive-damages award was sufficient to reward the plaintiff's counsel for assuming the risk of bringing the lawsuit and to encourage other victims of wrongdoing to come forward. Green Oil, 539 So.2d at 223. See also Life Ins. Co. of Georgia v. Parker, 726 So.2d 619, 624 (Ala.1998). There is evidence indicating that Mrs. Jeter's attorneys expended significant time and money in pretrial, trial, and posttrial proceedings, and that their expenses exceeded $130,000 before the appeal. Because we recognize the need for attorneys who are willing to pursue litigation on a contingency basis for individuals like Mrs. Jeter who might not be otherwise able to undertake the costs of litigation, this factor weighs against a finding that the trial court's remittitur was excessive.
6. Criminal sanctions.
Although the Alabama Deceptive Trade Practices Act provides for a misdemeanor conviction for a violation of the Act, there is no evidence that such an action will be pursued in this case. This factor is therefore inapplicable.
7. Other civil actions.
Although Orkin is subject to a class-action lawsuit in Houston County, the issues in that action do not relate to the issues presented in this case. This factor is therefore inapplicable.
*43 8. Summary of the Hammond/Green Oil analysis.
After considering the seven Hammond/Green Oil factors, we conclude that two of the factors are inapplicable. Two of the factors weigh against a finding that the punitive-damages award as remitted by the trial judge is excessive: the reprehensibility of the Orkin defendants' conduct and the costs of litigation. Three of the factors weigh in favor of a finding that the award is excessive: the relationship between the punitive-damages award and the actual or likely harm, the Orkin defendants' profit from their misconduct, and the Orkin defendants' financial position.
C. Final Analysis of the Punitive-Damages Award
We now return to a final consideration of the excessiveness of the remitted punitive-damages award in light of BMW. Based upon the reprehensibility of the Orkin defendants' conduct, countered by the potential for economic loss by the Orkin defendants for misconduct related to this single transaction, we conclude that a $2,000,000 punitive-damages award is sufficient to punish the Orkin defendants and to deter them from further conduct similar to that evidenced in this case, without compromising their due process rights.

V. Conclusion
The judgment of the trial court is affirmed, on the condition that Mrs. Jeter's estate file with this Court, within 21 days, a remittitur of the compensatory-damages award to $300,000 and of the punitive-damages award to $2,000,000; otherwise, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
SEE, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
HOUSTON, J., concurs specially.
MOORE, C.J., concurs in part and dissents in part.
HOUSTON, Justice (concurring specially).
I write only to address the punitive-damages issue. I still adhere to punitive damages bearing a ratio to compensatory damages of 3:1 as a benchmark in a case where substantial compensatory damages have been awarded. A benchmark is not set in stone. If the conduct is extremely egregious, as it was in this case, I agree that the ratio should be adjusted upwards.
I have served as a Justice on this Court for more than 16 years. The reprehensibility of the defendants' conduct was greatas great as any I remember. To save money, the defendants violated their duty to Mrs. Jeter and subjected her to bodily injury or death in what she thought was the safe sanctuary of her home. I *44 have no hesitation in supporting a $2,000,000 punitive-damages award in this case, regardless of the ratio such award bears to the compensatory damages.
MOORE, Chief Justice (concurring in part and dissenting in part).
I would affirm the judgment of the trial court, without a further remittitur. I respectfully dissent from that part of the opinion requiring an additional remittitur of the damages awards; I would defer to the trial judge, who was present during the fact-finding process of the trial.
NOTES
[*] Note from the reporter of decisions: On November 28, 2001, the Supreme Court issued a "certificate of judgment of affirmance" reading as follows:

"WHEREAS, in keeping with the former order and judgment of this Court entered on November 9, 2001, the appellee, Robert Jeter, as representative of the estate of Artie Mae Jeter, as substitute party plaintiff, did on November 21, 2001, file in this Court a remittitur in the amount of $2,100,000 ($100,000 compensatory, $2,000,000 punitive).
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $2,300,000 ($300,000 compensatory, $2,000,000 punitive) and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
"IT IS FURTHER ORDERED AND ADJUDGED that the appellants, Orkin Exterminating Company, Inc., et al., pay the costs of appeal and the costs taxed against the defendants in the court below will stand as taxed."