[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 319 
Anthony Harrelson appeals from the Conecuh Circuit Court's judgment, entered on a jury verdict, in favor of R.J., individually and as mother and next friend of J.B. We affirm.
 Facts and Procedural History
The evidence at trial revealed the following facts. On Sunday, March 14, 1999, R.J. allowed her 15-year-old daughter, J.B., to spend the night with J.B.'s 15-year-old friend, M.B., after the two had returned from a weekend ROTC meet. At that time, M.B. lived with her mother and with her stepfather, Anthony Harrelson. The girls spent the afternoon at home with Anthony while M.B.'s mother was at work. After M.B.'s mother came home, M.B. and J.B. asked M.B.'s mother and Anthony if they could have a wine cooler that was in the refrigerator. M.B.'s mother and Anthony said no, and the girls did not ask about it again.
Later that night, M.B.'s mother and Anthony went to a nightclub to celebrate Anthony's birthday, leaving M.B. and J.B. alone in the house. The girls spent the evening watching television, talking on the telephone, and using the computer. Eventually, they went to sleep in M.B.'s bed, which was positioned under the window in her bedroom. M.B. testified that she always locked her bedroom door before going to sleep at night, and that when she and J.B. went to sleep, her bedroom door was locked.[1]
In the early morning hours of March 15, 1999, M.B. and J.B. were awakened when Anthony tapped on M.B.'s bedroom window. Anthony told M.B. that he and her mother were locked out of the house. Apparently, *Page 320 
M.B.'s mother was very intoxicated and had become ill in the car on the way home. M.B. got up and unlocked one of the doors for Anthony and her mother. When M.B. opened the door, her mother walked into the house and fell on the floor; eventually, she got up and went to bed. M.B's mother testified that, after she went to bed, she did not awaken for the rest of the night.
M.B. went back to her bedroom, locked the door, and she and J.B. fell asleep. A short time later, the girls were awakened again when Anthony tapped on the window. M.B. opened the window, and Anthony began talking with them. At some point during the conversation, Anthony asked M.B. and J.B. if they wanted the wine cooler that was still in the refrigerator. Anthony gave them the wine cooler through the window and M.B. and J.B. drank it. J.B. testified that while Anthony was talking to her through the window, she could tell that he had been drinking because she could smell alcohol and because he was talking and acting differently than he normally did. She said that Anthony told her that she was "hot," and she believed that he was flirting with her. M.B. testified that she did not know what to think about Anthony's demeanor toward J.B., but that the conversation made her uncomfortable. During the course of the conversation with Anthony, M.B. and J.B. each left the bedroom to go to the bathroom. J.B. was the last one to come back into the bedroom, and she did not lock the door.
After the girls finished the wine cooler, they passed the empty bottle back through the window to Anthony, who threw it into a nearby field. Anthony left to feed his pet wolves, and the girls closed the window and went back to sleep. J.B. testified that she was awakened a short while later by Anthony, who was standing over her and touching her. J.B. testified that Anthony got on top of her and held her breasts and kissed her thigh. J.B. testified that she was too shocked and too scared to scream and that she did not know what to do. She said that she tried to pretend that she was asleep and that she rolled over closer to M.B., hoping that Anthony would leave. She said that Anthony then touched her, inserted his fingers into her vagina, and made obscene requests of her. M.B. testified that she awoke when she heard Anthony making the obscene requests of J.B.M.B. then jumped out of bed, pretending that she thought that it was time to get up for school. M.B. said that she could see Anthony's figure in her room and that she heard the sound of papers crinkling on the floor near her bed as he left the room.
After Anthony left, J.B. and M.B. both got out of bed. When J.B. told M.B. what Anthony had done, both girls started crying. They did not sleep for the rest of the night. The next day at school, J.B. told one of her teachers what had happened. The teacher insisted that J.B. inform the principal and assistant principal; she did so and the principal and assistant principal then contacted the Department of Human Resources ("DHR"). DHR interviewed J.B., M.B., M.B.'s mother, Anthony Harrelson, and R.J.
The State brought criminal charges against Anthony Harrelson. He was tried and convicted of sexual abuse in the second degree, a violation of § 13A-6-67, Ala. Code 1975, and a Class A misdemeanor. It is unclear from the record what, if any, sentence Anthony received as a result of the misdemeanor conviction.[2] *Page 321 
On April 7, 1999, R.J., individually and as mother and next friend of J.B., sued the Harrelsons. In her complaint, R.J. alleged assault and battery and the intentional infliction of emotional distress, i.e., the tort of outrage, against Anthony, negligence against M.B.'s mother, and loss of services of a child against Anthony and M.B.'s mother. The case was tried before a jury. At the close of the evidence, the trial court entered a judgment as a matter of law in favor of both defendants as to R.J.'s claim for loss of services of a child and in favor of M.B.'s mother as to R.J.'s negligence claim. M.B.'s mother was then dismissed from the action.
The assault-and-battery and tort-of-outrage claims were then submitted to the jury. The jury returned a verdict in favor of R.J. on both counts. The jury awarded R.J. $5,000 compensatory damages and $25,000 punitive damages on the assault-and-battery claim. The jury awarded R.J. $10,000 compensatory damages and $50,000 punitive damages on the tort-of-outrage claim. Anthony now appeals.
 Discussion I.
Anthony argues that the trial court erred in denying his motion at the close of the evidence for a judgment as a matter of law ("JML")[3] as to R.J.'s claim alleging the tort of outrage because, according to Anthony, R.J. failed to produce sufficient evidence to demonstrate that J.B. actually suffered severe emotional distress. Our standard of review for a motion for a JML is well settled:
 "`We apply the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is "indistinguishable from the standard by which we review a summary judgment."' Alabama Power Co. v. Aldridge, 854 So.2d 554, 560 (Ala. 2002) (quoting Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001)). `We must decide whether there was substantial evidence, when viewed in the light most favorable to the plaintiff, to warrant a jury determination.' Id. (citing City of Birmingham v. Sutherland, 834 So.2d 755 (Ala. 2002)). `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)."
Wal-Mart Stores, Inc. v. Smitherman, 872 So.2d 833, 837 (Ala. 2003). Thus, in reviewing the evidence in this case, we construe most favorably to R.J. the facts and any reasonable inferences the jury could have drawn.
This Court, in 1980, recognized the tort of intentional infliction of emotional distress, or the tort of outrage, and defined the parameters for such an action:
 "[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under *Page 322 
the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement
[(Second) of Torts], supra, at 78 [(1948)]. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72."
American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1980). Furthermore, this Court explained:
 "It should also be noted that this tort does not recognize recovery for `mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' Comment, Restatement, supra, at 73. The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress."
American Road Serv. Co., 394 So.2d at 364-65.
Thus, in order to prevail on her tort-of-outrage claim, R.J. was required to present substantial evidence indicating that Anthony's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it."Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043
(Ala. 1993). On appeal, however, Anthony disputes only the third element of R.J.'s tort-of-outrage claim against him. Specifically, Anthony contends that because J.B. was able to complete high school and to join the military after the assault, she has failed to demonstrate that she suffered severe emotional distress as a result of Anthony's actions. Despite Anthony's contentions, however, R.J. has presented substantial evidence from which a jury could find that J.B. suffered severe emotional distress as a result of Anthony's conduct.
First, R.J., J.B.'s mother, testified that before the assault, J.B. did not easily show her emotions; in fact, R.J. described J.B. as "tough." However, according to R.J., after the assault J.B. became much more emotional, and she now cries much more often. Furthermore, R.J. said that she has noticed a change in J.B.'s demeanor around men. R.J. testified that J.B. now has more anger and "rebellion" toward men than R.J. had ever noticed J.B. exhibiting before the assault. R.J. further testified that she believes that J.B. now has problems trusting men.
J.B. likewise testified that after Anthony assaulted her, she became much more emotional and that she cries much more than she did before the assault. She testified that, for some time after the assault, which occurred around March 14 and 15, she would become hysterical around the 14th and 15th of each month. J.B. testified that she has been traumatized by the assault and that she has become a much more fearful person than she was before. She testified that although she has been to see "shrinks and stuff," visits with mental health experts only made her feel worse. J.B. also testified that since the assault she has had nightmares.
In an attempt to show J.B.'s emotional state, R.J. introduced into evidence poetry written by J.B.J.B. testified that, although only three of the poems were introduced at trial, she had a box full of them at home. The three poems introduced at trial were written shortly after J.B. was assaulted. In the first poem, entitled "Help," J.B. expresses feelings of guilt ("Someone help me see that I've done no wrong") and indicates that she wants to die ("If any can hear my cry tell me the solution is not to die"). Furthermore, she clearly expresses *Page 323 
feelings of hurt, pain, and anger toward Anthony ("I need to know how long I will hurt, . . . I will continue to be in pain. . . ."; "help me tell that SOB to go straight to hell!").
The second poem was written after J.B. had had a nightmare about seeing Anthony again. In that poem, J.B. wrote that she saw Anthony being taken to jail but that he then taunted her from his cell. The third poem again expresses J.B.'s fear while she was being assaulted, how she had tried not to let Anthony touch her, and her feelings of guilt at what had happened ("Don't tell yourself `it's all my fault' because it's not. You tried to keep your legs closed tight it's all you could do, your [sic] too scared to put up a fight.").
Thus, through J.B.'s testimony, J.B.'s poems expressing her feelings after the assault, and R.J.'s own testimony about J.B.'s behavior, R.J. produced evidence indicating that J.B. experienced severe emotional distress. Reviewing the evidence in a light most favorable to R.J., we conclude that she has produced evidence of such weight and quality that fair-minded persons in the impartial exercise of judgment could reasonably infer that J.B. had suffered emotional distress so severe that no reasonable person could be expected to endure it. Furthermore, other than his conclusory assertions that J.B. did not suffer severe emotional distress, Anthony provides no further facts or law to indicate that the trial court erred in denying his motion for a JML. Therefore, we affirm the trial court as to this issue.
 II.
Anthony's second argument is that the trial court erred in denying his motion to alter, amend, or vacate its judgment on the ground that the punitive damages were excessive. Specifically, Anthony alleges that the punitive-damages awards for the assault-and-battery and tort-of-outrage claims should be remitted because, he alleges, the ratio of the punitive damages to the compensatory damages is excessive, the punitive damages awarded will "result in [his] complete financial devastation," he has been criminally sanctioned for his actions, and because of "the effect of other civil actions" on his case.
We apply a de novo standard to punitive-damages awards. SeeNational Ins. Ass'n v. Sockwell, 829 So.2d 111, 135 (Ala. 2002) (citing Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala. 2001) (citing in turn Cooper Indus., Inc. v. Leatherman Tool Group,Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001))). Thus, the trial court's findings as to the alleged excessiveness of the punitive-damages awards carries no presumption of correctness. In BMW of North America v. Gore, 517 U.S. 559,116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the United States Supreme Court set out the following "guideposts" for courts to follow in evaluating whether an award of punitive damages is excessive: 1) the degree of reprehensibility of the conduct, 2) the ratio of the punitive damages to compensatory damages, and 3) sanctions for comparable misconduct.
First, it is undisputed that Anthony's conduct was extremely reprehensible. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of the reprehensibility of the defendant's conduct." BMW,517 U.S. at 575, 116 S.Ct. 1589 (footnote omitted). In this case, J.B., a 15-year-old, was staying in Anthony's house as a guest of Anthony's 15-year-old stepdaughter. While J.B. was in Anthony's home, Anthony, a married adult, gave J.B. alcohol and flirted with her. While J.B. was asleep in his stepdaughter's bedroom, Anthony intentionally entered an area of the house he was not allowed to enter. He then approached *Page 324 
J.B. while she was asleep next to his stepdaughter and molested her while making obscene requests of her. Anthony's conduct was criminal in nature. Anthony's assault on J.B. has affected her emotionally and has affected her relationships with others. The degree of reprehensibility of Anthony's conduct factors in favor of no mitigation of the punitive-damages awards against him.
Second, the punitive damages in this case were five times the relatively low compensatory-damages award. Although Anthony argues that a 5:1 ratio is excessive when considered in conjunction with the other factors, he cites no legal authority to support that argument. This Court has refused to apply a rigid formula to or set an upper limit on the ratio of punitive damages to compensatory damages awarded by juries. See OrkinExterminating Co. v. Jeter, 832 So.2d 25 (Ala. 2001). In upholding, after remittitur, an award of $300,000 in compensatory damages and $2,000,000 in punitive damages, we stated, "The guaranty of due process does not require that this Court apply a mathematical formula to determine whether a punitive-damages award is excessive; therefore, a remittitur generally is not justified solely on the basis of a high ratio." Orkin, 832 So.2d at 40 (citing Employees' Benefit Ass'n v. Grissett,732 So.2d 968, 979 (Ala. 1998)). Thus, a high ratio alone is generally not a basis for a remittitur.
Furthermore, Anthony must provide some legal basis for his allegation that the 5:1 ratio in this case is excessive. InState Farm Mutual Automobile Insurance Co. v. Campbell,538 U.S. 408, 410, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003), the United States Supreme Court discussed ratios, noting that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution. . . ." Although the 5:1 ratio in this case is not particularly high, the United States Supreme Court has noted that a greater ratio is permissible where "`a particularly egregious act has resulted in only a small amount of economic damages.'" Id. (quoting BMW, 517 U.S. at 582,116 S.Ct. 1589). Thus, the 5:1 ratio of the punitive-damages award to the compensatory-damages award in this particular case does not violate due process as guaranteed in the Fourteenth Amendment. Anthony's bare assertions that the 5:1 ratio in this case is excessive, standing alone, do not factor in favor of a remittitur.
Finally, Anthony's behavior is punishable by criminal statutes in the State of Alabama. Anthony's conduct could have been prosecuted as assault, which is prohibited by §§ 13A-6-20 through -22, Ala. Code 1975, and is punishable by imprisonment and the imposition of fines. Anthony was convicted of sexual abuse in the second degree, a violation of § 13A-6-67, Ala. Code 1975. Although Anthony incurred "fines and court costs" that approximated $2,000, it is unclear from the record what part of that sum consisted of court costs and attorney fees and what part of the sum actually represented the criminal sanction. Furthermore, although sexual abuse in the second degree is punishable by imprisonment, it is unclear from the record what, if any, sentence Anthony received as a result of the misdemeanor conviction. Additionally, the trial court judge who presided over this civil action also presided over the criminal case against Anthony, and the record indicates that the judge took into account the damages awarded against Anthony in sentencing him in the criminal case. Thus, Anthony has not demonstrated that this factor weighs favorably in support of a remittitur of the punitive-damages awards. *Page 325 
In summary, Anthony has not demonstrated that he is entitled to a remittitur on the basis of the BMW factors. He does not dispute that his conduct in this case was reprehensible, he has not demonstrated that the ratio of punitive damages to compensatory damages is excessive, and the record is unclear as to what criminal sanctions he may have received.
In Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), this Court set out the following seven factors for determining whether a jury's award of punitive damages is excessive: 1) Whether the punitive-damages award bears a reasonable relationship to the actual harm or the harm likely caused, 2) the reprehensibility of the defendant's conduct, 3) whether the defendant profited from the wrongful conduct, 4) the financial position of the defendant, 5) the costs of litigation, 6) criminal sanctions imposed, and 7) whether other civil actions have been brought against the same defendant for the same conduct. Because some of the factors do not apply to this case and because some of the factors are merely repetitive of the discussion of the BMW guidelines above, we address only the factors Anthony challenges in his appellate brief.
First, Anthony alleges that he is not in a financial position to pay the punitive-damages awards. The total punitive damages awarded on the assault-and-battery claim and the tort-of-outrage claim is $75,000. The record shows that Anthony's federal income tax return for 2001 reported that he earned approximately $61,000 in gross income for that year. Furthermore, Anthony and M.B.'s mother own property in Conecuh County that was appraised for the purpose of property taxes in 2001 at approximately $150,000. Additionally, Anthony testified that someone had offered him $150,000 for the property, but that he turned the offer down because he wanted at least $200,000 for it. Thus, the record simply does not support Anthony's allegations that the punitive-damages awards against him "will result in complete financial devastation for which there can be no relief."
Next, Anthony argues that the criminal sanctions against him should mitigate in favor of a remittitur. This issue was discussed extensively above; there is no need to repeat the discussion here.
Finally, Anthony argues that "the effect of other civil actions" should be considered in this case. We note, however, that there are no other civil actions in this case. Anthony seems to argue that, because R.J. was successful in bringing two separate claims against him — the assault-and-battery claim and the tort-of-outrage claim — the punitive-damages awards should be remitted. Anthony's legal argument as to this issue is unclear, and he has failed to cite any legal authority to support his assertions. Because it is not the function of this Court to create and research legal arguments for the parties, there is no need to address this issue further.
In summary, Anthony has failed to demonstrate that the factors enumerated by this Court in Green Oil weigh in favor of a remittitur of the punitive-damages awards against him.
 Conclusion
R.J. produced substantial evidence from which a jury could determine that J.B. suffered severe emotional distress as a result of Anthony's conduct. Furthermore, Anthony has failed to demonstrate that the guideposts set out by the United States Supreme Court in BMW and the factors set out by this Court inGreen Oil weigh in favor of a mitigation of the punitive damages awarded against him. Anthony has failed to demonstrate any error by the trial court, and he fails to support *Page 326 
many of his arguments with any legal authority. Therefore, we affirm the trial court's judgment in favor of R.J.
AFFIRMED.
HOUSTON, SEE, HARWOOD, and STUART, JJ., concur.
[1] In addition to testifying that she always slept with her bedroom door locked, M.B. and her mother testified that Anthony "was not allowed" in the back area of the house where M.B.'s bedroom was located. M.B. and her mother gave conflicting explanations for this rule.
[2] At a hearing concerning his financial status, Anthony testified that he had incurred "fines and court costs" from his criminal trial and that these fines and court costs were "close to $2,000."
[3] Anthony styled his motion as a "motion for a directed verdict." Rule 50, Ala. R. Civ. P., has been amended to rename the "motion for a directed verdict" a "motion for a judgment as a matter of law." See Lyons v. Walker Reg'l Med. Ctr.,868 So.2d 1071, 1076 n. 1 (Ala. 2003).